SOUTHWESTERN BELL TELEPHONE COMPANY *v.* BAGLEY & COMPANY.

Opinion delivered January 14, 1929.

*Edward B. Downie,* for appellant.

*Bogle & Sharp,* for appellee.

MEHAFFY, J. Bagley & Company, the appellee, is engaged in the cotton business in Memphis, Tennessee. L. A. Waddell was employed by appellee as a cotton buyer for its Memphis branch. On the 30th day of September, 1926, Waddell, representing Bagley & Company in Arkansas, purchased 132 bales of cotton from different parties in Cotton Plant, Arkansas, and, late the same afternoon, called the central office of the appellant at Brinkley, and told the operator that he wanted to talk to A. T.

LeFils at Memphis. After making repeated inquiries, Waddell was informed by the operator that he was connected with Mr. LeFils' home, but that Mr. LeFils was out, and that Mrs. LeFils was on the line. Waddell agreed to talk with her, and did talk with some woman who said she was Mrs. A. T. LeFils, and would convey to her husband the information that Waddell wanted him to have.

Waddell told her that he had purchased 132 bales of cotton, and she said she would convey the information to her husband. Waddell relied on the truthfulness of the statements made to him by appellant's operator at Brinkley that he was connected with the home of LeFils and talked with Mrs. LeFils. He did not have an opportunity to talk with LeFils, and did not talk with him until the evening of the following day, after the market had closed. He then learned that appellant's employees had not connected him with LeFils' home, and that he had talked to some other party.

If Waddell had talked to Mrs. LeFils or LeFils, and given him the information that he had purchased 132 bales of cotton, LeFils would have sold a similar number of bales on the future market the morning of October 1. He could, on October 1, have sold 132 bales of cotton for 14.25 cents per pound, but, because of his failure to communicate with LeFils at that time, he was forced to sell for 13.53 cents per pound, the market having declined.

Appellee alleges that, on account of defendant's carelessness and negligence, it has been damaged 72/100 cents per pound on 132 bales, a total of $475. Appellee's contention is that he lost the amount of money sued for, not on the bales of cotton that he actually bought in Arkansas, but because he did not buy futures on October 1, and that he lost the difference between the price on October 1 and the price at the time he got the information; that the damage was caused by the telephone company negligently giving him the wrong party.

Waddell testified that he lives at Brinkley, and was a cotton buyer for Bagley & Company, and that Bagley

& Company's main office is in Nashville, Tennessee; that he bought the 132 bales of cotton, as alleged in the complaint, and he was in the habit of telephoning to the Memphis branch when he would buy cotton, so that the Memphis office could sell cotton against it—in other words, hedge. He testified that they would have sold cotton on the board, and would not have sold it for delivery; would just sell at future market, and if the price went up he would be all right, and if it went down, he would take a loss on that purchase. He did not sell the 132 bales that he had purchased, but what they wished to do was to sell on the board 132 bales to protect the cotton that witness had bought. It was never the intention to deliver that cotton. It was merely sold on the board. After they would sell this on the board, then, when the actual cotton was sold, he would take up his hedge. On that particular business, if he sold the 132 bales, he did not intend to deliver any actual cotton. He would deliver against his selling. When selling on the board, he doesn't intend that there is going to be an actual delivery.

There was considerable evidence about the negligence of the appellant company and about the manner in which cotton was bought and sold, and the damages that resulted on account of the negligence of the appellant in this case. We do not think it necessary to set out any of that testimony, for the reason that the appellee itself states that the telephone communication was desired for the purpose of selling futures.

Appellant submits four reasons why the judgment should be reversed. First, it is contended that the damages are special, and appellant had no notice or knowledge of the circumstances, etc. It also contends that appellee was guilty of contributory negligence; and also that, under the rule of the company, it does not assume the responsibility of insuring that the party answering the telephone is the party called for. We do not decide any of these questions, for the reason that, according to appellee's own showing, this was a gambling trans-

action and is prohibited by our statute, and for that reason no recovery can be had in this case.

Section 2652 of Crawford & Moses' Digest prohibits maintaining an office for dealing in futures, and § 2653 of Crawford & Moses' Digest reads as follows:

"Every contract or agreement, whether or not in writing, whereby any person or corporation shall agree to buy, or sell and deliver, or sell with an agreement to deliver, any wheat, cotton, corn, or other commodity, stock, bond, or other security, to any person or corporation, when in fact it is not in good faith intended by the parties, or either of them, that an actual delivery of the article shall be made, is hereby declared to be unlawful, whether made or to be performed wholly within this State or partly within and partly without the State; it being the intent of this act to prohibit any or all contracts and agreements for the purchase of or sale and delivery of any commodity or other thing of value on margin, commonly called dealings in futures, when the intention or understanding of the parties or either of them is to receive or pay the difference between the agreed price and the market price at the time of settlement, and any person violating the provisions of this section, for each transaction shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in any sum not less than five hundred nor more than five thousand dollars, and upon conviction for a second offense, in addition to said fine, the defendant shall be imprisoned in the county jail not exceeding twelve months."

The appellee, however, contends that the cases of *Harris* v. *Western Union Tel. Co.*, 136 Ark. 63, 206 S. W. 52, and *Western Union Tel. Co.* v. *Osborne*, 136 Ark. 68, 206 S. W. 54, are cases where the facts are similar to the facts in the present case. Or rather, he contends that the facts in the instant case bring it clearly within the rule announced by this court in the two cases above mentioned.

In the case of *Harris* v. *Western Union Tel. Co.,* 136 Ark. 65, 206 S. W. 52, this court said: ''The testimony affirmatively shows that actual delivery of the corn bought and sold was contemplated by the parties, and the transactions set out above were evidenced by elevator receipts for corn duly assigned.''

In the instant case the testimony affirmatively shows that there was no actual delivery of the cotton contemplated. On the contrary, the appellee's witnesses themselves and the purchaser, Mr. Waddell, testify that there was no intention to deliver any actual cotton, but that this was merely selling futures in order to hedge or protect themselves on the purchase of the 132 bales. No one claims that there was any actual delivery of cotton contemplated, but, on the contrary, the undisputed proof shows that the intention was not to deliver any actual cotton. It was therefore a transaction to sell in violation of the statute. The statute says that every contract whereby a person shall agree to buy or sell and deliver, * * * when in fact it is not in good faith intended by the parties, or either of them, that an actual delivery of the article shall be made, is hereby declared to be unlawful, whether made or to be performed wholly within this State or partly without the State. The statute further provides: ''It being the intent of this act to prohibit any or all contracts and agreements for the purchase or sale and delivery of any commodity or other thing of value on margin.''

The appellee's witnesses all agree that this was on margin; that it was dealing in futures, the very thing prohibited by the statute.

This court has said, in discussing the above statute:

''A mere message containing merely a narrative of a past sale would not be either within the spirit or the letter of the statute, for it would not relate to an unlawful sale merely by giving information that there had been such a transaction. But, where the message constitutes an acceptance or offer, it necessarily relates to a

purchase or sale, whether there be a consummation of the deal or not." *State* v. *Western Union Tel. Co.,* 160 Ark. 444, 254 S. W. 838.

In the instant case appellee's witnesses all testify that there was to be no delivery, and they claim damages solely on the ground that the failure to connect them with the right party prevented them from buying futures. One cannot recover damages because another refuses to do what the statute forbids.

There seems to be some conflict in authority with reference to the liability of transmission companies, especially where there is no statute on the subject. The following is a fair statement of the law:

"While a telegraph company may not refuse to transmit or deliver messages relating to 'futures' or similar gambling transactions, or escape a statutory penalty for failing to transmit such messages, yet the amount of damages to be recovered for an error made in the transmission of such are only nominal, and cannot exceed the amount paid for their transmission. There is a distinction between real gambling and dealing in what is commonly called 'futures;' and this distinction gives those dealing in the latter a right similar to that enjoyed in the transmission of ordinary messages. It is presumed in the 'future' contracts that there is to be a delivery of the goods; but in gambling there is a wager outright for a loss or a gain. These companies are under no obligations to accept messages for transmission which are purely gambling messages, for to do so would be contrary to law, good morals, and public policy." Jones on Telegraph and Telephone Companies, § 429.

The distinction made in the above text between messages as to real gambling and dealing in futures is put on the ground that, in buying futures, there is an intent to deliver the property bought; but in the instant case all the proof shows that this was a gambling contract, pure and simple.

The Supréme Court of Pennsylvania, discussing this question, said:

"But, when ventures are made upon the turn of prices alone, with no *bona fide* intent to deal in the article, but merely to risk the difference between the rise and fall of the price at a given time, the case is changed. The purpose then is not to deal in the article, but to stake upon the rise or fall of its price. No money or capital is invested in the purchase, but so much only is required as will cover the difference—a margin, as it is figuratively called. Then the bargain represents not a transfer of property, but a mere stake or wager upon its future price. The difference requires the ownership of only a few hundreds or thousands of dollars, while the capital to complete an actual purchase or sale may be hundreds or thousands or millions. Hence ventures upon prices invite men of small means to enter into transactions far beyond their capital, which they do not intend to fulfill, and thus the apparent business in the particular trade is inflated and unreal, and, like a bubble, needs only to be pricked to disappear, often carrying down the *bona fide* dealer in its collapse. Worse even than this, it tempts men of large capital to make bargains of stupendous proportions, and then to manipulate the market to produce the desired price. This, in the language of gambling speculation, is making a corner—that is to say, the article is so engrossed or manipulated as to make it scarce or plenty in the market at the will of the gamblers, and then to place its price within their power. Such transactions are destructive of good morals and fair dealing and of the best interests of the community. If the article be stocks, corporations are crushed and innocent stockholders ruined to enable the gambler in its price to accomplish his ends. If it be merchandise, *e. g.*, grain, the poor are robbed, and misery engendered." *Kirkpatrick* v. *Bonsall*, 72 Penn. 155.

Not only are the statements above copied from the Pennsylvania case true, but to hold that a person seeking to transmit messages for the purpose of dealing in

futures could recover damages for failure to transmit such messages would be to aid and assist in the gambling transaction. It would be aiding and assisting to violate the statute.

In the instant case, to hold that the appellee could recover would be, in effect, to hold that any one in Arkansas could require a transmission company to receive and transmit messages dealing in futures, in violation of the statute, and that is one of the things the Legislature intended to prohibit.

This court said, many years ago, when the statute was nothing like as plain and comprehensive as it is now:

"Certainly the Legislature did not intend to impose any restrictions upon legitimate commerce, but only to destroy the parasite that infests it. Contracts for future delivery, if entered into in good faith and with an actual intention of fulfillment, are as valid as any other species of contract. A farmer may sell and agree to deliver his wheat or his cotton for a stipulated price before it is harvested. Nay, one may sell goods to be delivered at a future day which he has not in actual or potential possession, but which he intends to go into the market and buy. But this is not what is commonly known as dealing in futures. This phrase has acquired the signification of a mere speculation upon chances, where the grain, cotton or stocks dealt in exist only in imagination, and where no delivery is contemplated, but the parties expect to settle upon the difference in the market." *Fortenbury* v. *State,* 47 Ark. 188, 1 S. W. 58. See also *Huff* v. *State,* 164 Ark. 211, 261 S. W. 654; *William W. Cohen & Co.* v. *Austin,* 172 Ark. 723, 290 S. W. 579.

Our statute expressly forbids dealing in futures. The testimony in this case shows that it was not the intention of the parties to sell cotton, and that it was dealing in futures, because there was no intention to deliver, and this is the thing prohibited by the statute. No person can be required to do what the statute prohibits, and no person is liable in damages to another if he refuses to do what the statute makes a crime.

The appellee referred to the case, as we have already said, of *Western Union Tel. Co.* v. *Osborne*, 136 Ark. 68, 206 S. W. 54. In that case there was no wager— no dealing in futures, and no violation of the statute. But that was a contract for furnishing market reports. Such a contract is not prohibited, and we therefore think that that case has no application here.

In the case last referred to, the court said that it was the foundation of the plaintiff's cause of action that he purchased 40 bales of cotton on the basis of the market report erroneously furnished him by the defendant, to his loss and damage. The company having agreed to furnish cotton market reports, was required to do so. The court further said that plaintiff was in the business of buying cotton and selling it again at a profit; that the defendant knew this fact, and made a contract with him to furnish the market reports daily, knowing that these reports would be used by him as a basis for buying cotton. It is no violation of the statute to furnish market reports, and in the last case referred to, and relied on by appellee, there is nothing to indicate that there was to be any gambling or dealing in futures.

Having reached the conclusion that this suit is based on the negligence of appellant in failing to give the appellee the right party, thereby enabling it to deal in futures, it becomes unnecessary to discuss or decide the other questions discussed by counsel. The transaction or contract that the appellee desired to enter into or make was dealing in futures, in violation of the statute. And, as the Pennsylvania court has said, such transactions are destructive of good morals and fair dealings and of the best interests of the community.

The judgment of the circuit court will therefore be reversed, and the cause dismissed.