J. L. McENTIRE & SONS, Inc., *v.*
HART COTTON Company, Inc.

73-297                          511 S.W. 2d 179

Opinion delivered July 8, 1974
[Rehearing denied September 16, 1974.]

*Jones, Matthews & Tolson,* for appellants.

*Bridges, Young, Matthews & Davis; Fried, Frank, Harris, Shriver and Jacobson* and *Coleman, Gantt, Ramsay & Cox,* for appellees.

Amicus Curiae for American Textile Manufacturers Institute, Inc. by: *James H. Wilson, Jr., Bennett L. Kight, C. Christopher Hagg* and *John W. Bonds, Jr.*

WILLIAM H. SUTTON, Special Justice. Appellants are twelve cotton growers. Between January 25, 1973 and March 22, 1973, each of them by separate contract agreed to sell his 1973 cotton crop to one of the appellees who are cotton merchants. While all of the contracts are not identical, the differences are not critical to the issues on appeal.

The contracts provided that appellants would plant certain cotton acreage and, using good farming methods, deliver the quantity grown to a designated location for a price stipulated in the contract.

After the contracts were made but before the cotton was to be delivered, the cotton market began an unprecedented

rise which reached in some cases more than double the price at which appellants had agreed to sell. Appellants filed actions for declaratory judgments seeking a determination that the contracts were void because prohibited by *Act 208, Acts of Arkansas, 1929*. They also contended that the contracts lacked mutuality and were unconscionable. The Chancellor, holding that the contracts were valid, granted summary judgment for each of the appellees. We feel that he was correct.

Section 2 of Act 208 which is the primary provision relied upon by appellants provides:

> "All contracts of sale for future delivery of cotton, grain, stocks, or other commodities (1) made in accordance with the rules of any Board of Trade, exchange or similar institution where such contracts of sale are executed and (2) actually executed on the floor of such Board of Trade, exchange or similar institution and performed or discharged according to the rules thereof; and (3) when such contracts of sale are made with or through a regular member in good standing of a cotton exchange, grain exchange or similar institution organized under the laws of the State of Arkansas or any other State shall be, and they are hereby declared to be valid and enforceable in the courts of this State according to their terms, provided, that contracts of sale for future delivery of cotton in order to be valid and enforceable as provided herein must not only conform to the requirements of clauses (1), (2), and (3), but must also be made subject to the provisions of the United States Cotton Futures Act, approved August 11th, 1916; provided, further, that if this clause should for any reason be held inoperative then contracts for the future delivery of cotton shall be valid and enforceable if they conform to the requirement clauses one, two and three of this section."

The cotton merchants admit that no attempt was made to comply with the procedures outlined by the above statute. They argue that it has no mandatory application to the kinds of contracts made by them.

Appellants argue with some logic that while Section 2 of the Act has no direct prohibitionary language against any

kind of contract, the Legislature specified requirements which must exist in order for a contract for future delivery of cotton to be enforceable. It follows, say appellants, that those contracts not made in accordance with the statute are void.

Section 2 of Act 208 is not free from ambiguity. Stripped of its legislative history and without the enlightenment of judicial pronouncements prior to its passage in 1929, it is, perhaps, arguable that the purpose of the act was to severely restrict agreements to buy cotton for future delivery. But we believe a careful review of the act in its proper setting reveals an intent on the part of the legislature to (1) enlarge the permissible scope of trading in commodities futures and (2) to carefully regulate the newly enlarged activities. We do not believe that the regulations apply to contracts like those now under review.

The parties to this appeal agree that prior law is most important in arriving at a correct interpretation of Act 208. They concur that the General Assembly, in enacting legislation, is presumed to be familiar with the holdings of the Arkansas Supreme Court. *Lumbermens' Mutual Casualty Company* v. *Moses,* 224 Ark. 67, 271 S.W. 780 (October 1954).

*Act 118, Acts of Arkansas, 1883* characterized dealing in futures as gambling and flatly prohibited the practice as a criminal act. However, in *Fortenbury* v. *State*, 47 Ark. 188, 1 S.W. 58 (1886) the Court distinguished between dealing in futures and contracts for future delivery of actual commodities. It was there said:

> "Certainly the Legislature did not intend to impose any restrictions upon legitimate commerce, but only to destroy the parasite that infests it. Contracts for future delivery, if entered into in good faith and with an actual intention of fulfillment, are valid as any other species of contract. A farmer may sell and agree to deliver his wheat or his cotton for a stipulated price before it is harvested."

Under definitions of the *Fortenbury Case*, the contracts made by the parties to this appeal would be deemed legal contracts for future delivery and not illegal dealings in futures.

*Act 162, Acts of Arkansas, 1907,* continued the prohibition against dealing in futures "when the intention or understanding of the parties or either of them is to receive or pay the difference between the agreed price and the market price at the time of settlement . . ."

Construing the 1907 Act, the Court reaffirmed in *Huff* v. *State,* 164 Ark. 211, 261 S.W. 654 (1924), and in *Southwestern Bell Telephone Company* v. *Bagley & Company,* 178 Ark. 876, 125 S.W. 2d 782 (1929) that dealing in futures was illegal gambling, even if done in accordance with the rules of an exchange and even if the conduct in question amounted to a simple hedge against market fluctuations.

We fell that the Legislature recognized in 1929 that the broad prohibition against dealing in futures was an unjustified restraint on many forms of legitimate commerce. Act 208 represents a careful effort to relax the former blanket restraints to allow legitimate trading in some areas which were once forbidden. Along with the enabling provisions the Legislature included safeguards to prevent abusive speculation in the newly opened areas of trading. To insure against resurrection of the old gambling nemesis the act required that contracts for future delivery of cotton, in order to be valid, must essentially be made through a recognized Board of Trade or an exchange. However, this requirement applies only to that body of trading authorized by Act 208, and may not be used to invalidate contracts such as those now before us which have always been considered lawful.

In so construing the act we believe that we have honored the principles for statutory interpretation offered in *Ark. Highway Commission* v. *Mabry,* 229 Ark. 261, 315 S.W. 2d 900 (1958) as follows:

"In arriving at the intention of the lawmaking power it is proper to consider the object to be secured, the circumstances attending the adoption of the measure, and its relation to other laws. Perry County v. House, 196 Ark. 317, 117 S.W. 2d 342."

Under appellants' interpretation of the statute it is most difficult to imagine what evil the Legislature could hope to

cure by striking down agreements such as those made by these parties. It is patently clear that the General Assembly has constantly sought to abrogate the evil of "bucket shop" operations which amount to wagering on market quotations with no real contribution to legitimate commerce. None of that is involved here. While we do not substitute our judgment for that of the Legislature's in defining wrongdoing we are most reluctant to apply all but the clearest mandates to penalize parties with whom we can find no fault. We have not recognized conduct on the part of any of these parties or practices followed by any of them which can be logically coincided with the social ills known to be the target of Act 208.

It is contended by appellants that the contracts should be voided as unconscionable. Section 85-2-302 (1) of the Uniform Commercial Code relied upon by them provides:

"If the court as a matter of law finds the contract or any clause of the contract to have been made unconscionable *at the time it was made* the court may refuse to enforce the contract . . . "

The contracts in question are to be reviewed under the circumstances that existed at the time they were made and not in retrospect. The record reflects that when the parties made their respective agreements, appellants considered the prices offered for their cotton to be good. Based on prior years, they were. There is no claim that appellees knew of the drastic price increases which were to occur later. So far as was known at the time, prices could have fallen as easily as they could have risen. There is simply no basis upon which a court would be justified in finding the contracts to be unconscionable.

It is contended that the contracts ought to be voided because they lack mutuality. Appellants say that the agreements are not binding on appellees and, therefore, ought not to be enforced against appellants. We don't agree. In most of the contracts there was a rather ordinary promise to sell and a corresponding promise to buy. Mutual promises which constitute consideration for each other are the classic method of satisfying the doctrine of mutuality. *Johnson* v. *Johnson*, 188 Ark. 992, 68 S.W. 2d 465 (1934).

Emphasis is placed on the contracts of Appellee Harlow Sanders. Sanders used a form which identified Sanders as agent of the grower and recited that he had sold the cotton for a stipulated price. In each case the cotton was sold to a textile mill. Those appellants doing business with Sanders contend that they could not have enforced the agreements against Sanders because he had made no promise to pay. Whether Sanders was obligated to pay or whether that obligation was enforceable against the mills to whom Sanders sold doesn't seem to be too important. The critical issue is whether, under the contract arrangements in each case there was an enforceable promise to buy for each promise to sell. We believe there was.

Finally, it is argued that the Chancellor erroneously failed to consider a deposition taken in one of the earlier cases when offered in a later case. Since the issues were the same in the cases where the deposition was considered and those where it was not and since the deposition alters none of the facts felt to be dispositive of the issues before us, we do not find it necessary to determine whether the deposition was properly excluded from consideration in some of the cases.

Affirmed.

Harris, C.J., and Fogleman and Byrd, JJ., disqualified and not participating. Special Chief Justice Robert Shults and Special Justice Frank Snellgrove join in the opinion.