**BANK OF INDIANA, NATIONAL ASSOCIATION, Plaintiff,**

v.

**Clyde HOLYFIELD, et ux, Defendants.**

Civ. A. No. J77–0036(N).

United States District Court,
S. D. Mississippi,
Jackson Division.

July 24, 1979.

A. Spencer Gilbert, III, Jackson, Miss., for plaintiff.

Richard M. Edmonson, Jackson, Miss., for defendants.

## MEMORANDUM OPINION

NIXON, District Judge.

The defendants in this action, Mr. and Mrs. Holyfield, are dairy farmers in Simpson County, Mississippi who entered into a lease for the use of certain dairy cows in their milking operation with a company that subsequently merged with the plaintiff, the Bank of Indiana (Bank). A large number of the leased cows were destroyed by a storm, and the defendants were unable to comply with the terms of the lease as it was written. This action was brought by the Bank to recover from the defendants alleged deficiencies in their lease payments, and the Holyfields interposed certain defenses to the validity of their obligations under the lease. The case was tried before the Court without a jury, and the following constitutes this Court's findings of fact and conclusions of law.

### Findings of Fact

Mr. and Mrs. Holyfield have been engaged in the dairy farming business in Simpson County, Mississippi for many years. Mr. Holyfield has an eighth grade education and has been engaged in dairy farming all his life; Mrs. Holyfield completed high school and has been helping her husband in the dairy farming operation for many years. Prior to the events which spawned this lawsuit the Holyfields also ran a milk hauling business, which was unsuccessful and thus abandoned.

Efficient and profitable operation of their dairy farm required defendants to obtain additional dairy cows, but their relatively poor financial condition precluded their doing so except through the avenue of leasing.

In July, 1974, the defendants had about 200 cows in their operation and a dairy facility on their 700 acre dairy farm, which consisted of a modern milking parlor, automatic milkers, pipeline conveyor, feed bins, silos and a concrete holding area. These expensive facilities were financed through loans from a savings and loan association in the approximate amount of $100,000, from

an individual in the sum of $31,000, and from a bank in Mendenhall for about $100,-000. Of the 200 cows the defendants had in their operation before they leased the cows in question, 100 were owned and 100 were leased from Modern Dairy.

In July, 1974 the Holyfields talked to one Johnny Colebank about leasing additional dairy cows. They had dealt with Colebank before and in fact had leased cows from Modern Dairy through Colebank, who worked for an independent broker in Memphis, Tenn. named Sid Erwin, although the defendants understandably were of the impression that Colebank worked for Goodwin Brothers Leasing, Inc., and that Goodwin Brothers was a Memphis company operated by Sid Erwin. In fact, Goodwin Brothers Leasing was a Lexington, Kentucky operation in no way connected with Sid Erwin in Memphis. In 1975 Goodwin Brothers merged with the plaintiff Bank, and they will be treated as one and the same hereinafter. Colebank informed the defendants that he could arrange a cow lease with Goodwin Brothers and Sid Erwin, and instructed the Holyfields to send a copy of their 1973 income tax return (Exhibit P–5) to Erwin in Memphis, which they did. On July 20, 1974 a financial statement and a signed application were given to Colebank, who sent it on to Erwin, who in turn presented it to Goodwin Brothers in Lexington, Kentucky. The income tax returns were eventually returned to the defendants in an envelope (Exhibit D–15) which bore a Memphis, Tennessee mailing address. As noted above, throughout these activities Mr. Holyfield was under the impression that Goodwin Brothers was a Memphis company operated by Erwin.

The Holyfield's credit application was approved on August 1, 1974 and a lease agreement was prepared by Erwin in Memphis which on August 8 was presented to the defendants by Colebank at their home in Mendenhall, Mississippi. The defendants did not read the lease, which is not surprising in view of its length and complexity, and in fact Mr. Holyfield signed it while he was standing out in his front yard. The defendants placed great confidence in Cole-bank, who assured them this was a good lease and that they would be furnished field supervision of the cows, although they never were. Colebank also told them that Goodwin Brothers would carry insurance on the cows to protect against loss if the cows were killed, and the defendants thus relied entirely on Goodwin Brothers to furnish the necessary insurance coverage. The defendants were not aware that any of the terms of the lease were subject to negotiation and were not given a copy of the lease when they executed it, but were later mailed a copy. It is obvious to the Court from observing the defendants on the witness stand that they are far from being sophisticated business persons.

The defendants selected a person to buy the cows for them, since Goodwin Brothers customarily did not select the property to be leased in order to avoid any warranty claims in the event the leased chattels proved to be deficient. The Holyfields selected Colebank's father, who purchased for them a total of 115 cows for a total price of $70,000, which was paid by Goodwin Brothers.

The pre-printed lease in question (Exhibit P–1), contains 26 paragraphs of terms and conditions, on both sides, and is part of a package of documents totaling nine pages. Under the terms of the lease the defendants were obligated to pay, beginning on August 27, 1974, 57 monthly payments of $1,978.21 each, or a total of $125,692.60; one advance payment of $5,934.63 for the first and the last two months, and $7,000.00 to exercise a purchase option agreement to buy the cows at the end of the lease term of five years. The estimates of a useful life of a dairy cow varied at trial, but the Court finds that five years is a reasonable figure, though of course it may vary a great deal from cow to cow.

The entire risk of loss under the lease agreement was on the defendants. According to Dwight Tenney, the president of Goodwin in 1974 and an employee of the plaintiff, once the lease was set up on Goodwin's books, the $70,000 cost of the cows

paid out, and the credit life and casualty insurance premiums collected, Goodwin's obligations under the lease ended, except to keep up with the defendants' lease payments and the insurance payments. Tenney stated that if there was any loss of the leased cows through death or otherwise, Goodwin would look to the defendants to continue to pay the agreed rental and option fee in addition to replacing the cows at the lessees' expense.

The casualty insurance on the leased cows which was obtained by the lessor was completely inadequate. This coverage was placed through the Aetna Insurance Company, and the defendants were charged a premium for $70,000 of insurance coverage on what was first thought to be 100 cows, but later turned out to be 115 cows, and had a $500.00 per cow limit. If all of the 115 cows had been lost the day after the defendants received them, the total coverage would have been only $57,500.00, which would have fallen $12,500.00 short of even repaying the plaintiff original investment of $70,000.00, without providing in any manner for the defendants' continuing obligations under the lease.

There was no obligation on the plaintiff's part under the lease to give a rebate of any unearned charges. Even if such a rebate were given and the cows had been destroyed the day after the defendants received them, the defendants would have been charged at least an additional $21,-200.00—the above $12,500 deficiency plus $8,700 that the plaintiff had already put on its books as earned income. If no rebate for unearned income were given, in accordance with the lease language, the defendants would have been liable for the entire balance due under the lease, which would have been $70,642.60 (their obligations under the lease minus the insurance proceeds of $57,500.00; plus three annual installments of $3,150.00).

Mr. Holyfield testified that the cows were satisfactory and the defendants paid the lease amounts regularly for over one and one-half years after its execution. On March 26, 1976, a tornado struck the de-fendant's dairy farm, killing at least 30 of the leased cows and totally destroying the defendants' barn, fences and milking equipment. This was a double disaster because it made it impossible to milk the cows, and a dairy cow has to be milked regularly or it will quit producing milk and thus become useless as such. The defendants made every effort to secure milking facilities for the remaining cows but were unsuccessful, so the remaining 85 cows, with the consent and permission of the plaintiff, were sold as beef cattle at auction for $26,106.46. The insurance coverage paid the maximum of $500 per cow, or $15,000.

During the term of the lease when the defendants were milking the leased cows, they made actual cash payments of $41,-707.12 to the plaintiff, which consisted of 20 payments at $1,978.21, plus a security deposit of $3,956.42, less a shortage in the last payment of $1,813.50. In addition the plaintiff received the $26,106.46 from the proceeds of the sale of the cows, and $15,-000.00 from insurance proceeds, making a total of $82,812.76 received on the original $70,000.00 investment during a period of approximately 20 months.

According to the plaintiff's witness, Dwight Tenney, the money in excess of the initial $70,000.00 investment was treated internally as follows: $8,700.00 was taken immediately as earned income, $35,000.00 was treated as unearned income, and the balance of $4,992.60 was applied to the insurance premiums. The $7,000.00 for the purchase option was not calculated into the internal records (Exhibit D–6). According to the plaintiff's own records, the defendants were charged $43,700.00 for use of the original $70,000.00 investment for sixty months. All the indications are that the plaintiff treated this lease agreement internally as a promissory note inasmuch as their ledger card recites "Tot. Amt. of Note", "date of loan," "net disc." "security comaker or employer". In addition, another card in the plaintiff's file (Exhibit D–14) recites the "number of mos. int. chgd." and "date of loan". Additionally, plaintiff required the filing of a financial statement by the defendants as stated previously.

According to the plaintiff the amount of money the defendants owe it is $31,156.89, plus $2,472.75 late charges, plus 20% attorney's fees and expenses of litigation. The computations by which the plaintiff reaches the $31,156.89 figure are contained in Exhibit P–2.

One of the provisions of the lease agreement was that the agreement was only enforceable in Kentucky's courts, and another was that the lease was to be construed according to Kentucky law.

### Conclusions of Law

■ After careful consideration, we cannot say for a certainty that this agreement was actually a loan, rather than a lease, although it has many incidents of a loan, e. g., the ledger card, the fact the defendants, rather than the plaintiff, picked out and bought the cows, the low option to buy price at the end of the lease term, and the manner in which the plaintiff handled this matter in their accounting system. There is no dispute that both parties considered it to be a lease. The defendants do not contend that they thought they were buying cows, but rather knew that they were leasing them. The agreement is styled a lease, and it is couched in the language of a lease. The Holyfields had leased cows before and were aware of the procedure followed, and desired to increase their milk production using leased cows. Both parties considered it a lease at the time it was executed and the Court thus cannot say otherwise.

■ However, the issue of the lease's unconscionability is a different matter, and the Court has little difficulty finding this lease to be unconscionable. Initially, we note that despite the language in the lease to the contrary, we find that Mississippi law should control the interpretation of this lease. In *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), the Supreme Court said that forum-selection clauses contained in "freely negotiated private" agreements should be specifically enforced, unless the party resisting enforcement could "clearly" show that enforcement would be unreasonable and unjust. While the Court was addressing itself to the doctrine to be used by federal courts sitting in admiralty, this language also sets out the general rule applicable to all forum-selection clauses. In Restatement 2d, *Conflicts*, Sec. 203, Comment b, the following language is found:

b. Impropriety or mistake. A choice-of-law provision, like any other contractual provision, will not be given effect if the consent of one of the parties to its inclusion in the contract was obtained by improper means, such as by misrepresentation, duress, or undue influence, or by mistake. Whether such consent was in fact obtained by improper means or by mistake will be determined by the forum in accordance with its own legal principles. A factor which the forum may consider is whether the choice-of-law provisions is contained in an 'adhesion' contract, namely one that is drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms. Such contracts are usually prepared in printed form, and frequently at least some of their provisions are in extremely small print. * * *

This well describes the situation in the case at bar. The lease agreement was an adhesion contract in that it was obviously drafted by the plaintiff for its benefit and presented in a manner to the defendants which did not leave any room for negotiation of its terms. This conclusion is reinforced by the fact it was a printed contract, and so complex that a party with no training in the law could not hope to decipher all the potential disadvantageous terms therein. Unquestionably the requirement that any dispute over the lease be litigated in Kentucky and controlled by Kentucky law is unreasonable under the facts of this case. The defendants had no idea that they were dealing with a Kentucky company, since they had no direct contact with the plaintiff during the period the lease was being put together, nor did Colebank so inform them. The lease was executed in Mississippi and all the contacts between the parties to the

lease occurred in Mississippi. Of course, the communication between Erwin and Goodwin took place out of state, but the Holyfields did not know, or have any way of knowing, that this communication was taking place. The lease was drafted in Memphis and not in Kentucky, and at any rate the plaintiff has waived that portion of it which requires disputes to be settled in Kentucky by filing this action. The Court is not going to permit the plaintiffs to sit back and play a very minor part in the formulation of this lease, as far as the Holyfields were concerned, and then claim that the State of Kentucky, the domicile of Goodwin Brothers, has enough contacts with this contract to make it reasonable that Kentucky law should control disputes arising thereunder. In light of the substantial contacts this state has with this lease, when contrasted with the lesser connection with Kentucky and the hidden nature of the contacts with that state, it is far more reasonable for Mississippi law to control this lawsuit. Applying Kentucky law to the case would result in substantial injustice to the Holyfields, especially since the Holyfields were not aware that such a provision existed in the contract, and would not have signed it if they had been.

■ The law of Mississippi imposes an obligation of good faith and fundamental fairness in the performance of every contract governed thereby; in fact, this requirement is so pronounced that courts have the power to refuse to enforce any contract or limit the application of any clause therein in order to avoid an unconscionable result. Miss.Code Ann. § 75-2-302 (1972) states:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

■ There are no relevant cases interpreting this clause in Mississippi. Fortunately, however, one of the purposes of enacting the Uniform Commercial Code was to encourage uniformity in the commercial law of the nation, so the decisions of courts of other states are available and helpful. These decisions make it clear that the doctrine of unconscionability was intended to prevent oppression and unfair surprise, and not to relieve a party from the effect of a bad bargain. *Drink, Inc. v. Martinez*, 89 N.M. 662, 556 P.2d 348 (1976); *Wade v. Austin*, 524 S.W.2d 79 (Tex.Civ.App.1975). Thus in a series of cases where cotton producers sued to have their contracts with buyers declared unconscionable after the price of cotton had risen dramatically at delivery time above what it was at the time the contracts were made, the courts refused to declare the contracts unconscionable since both parties knew that the price could go up—or-down—and the growers had merely made the wrong business decision. *See, e. g., J. L. McEntire & Sons, Inc. v. Hart Cotton Co.*, 256 Ark. 937, 511 S.W.2d 179 (1974).

■ Unconscionability has been defined as "an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party." *Rodriguez v. Nachamie*, 57 App.Div.2d 920, 395 N.Y.S.2d 51 (1977). To show that a provision is conscionable, the party seeking to uphold the provision must show that the provision bears some reasonable relationship to the risks and needs of the business. *Geldermann & Co. v. Lane Processing, Inc.*, 527 F.2d 571 (8th Cir. 1975). The indicators of procedural unconscionability generally fall into two areas: (1) lack of knowledge, and (2) lack of voluntariness. A lack of knowledge is demonstrated by a lack of understanding of the contract terms arising from

inconspicuous print or the use of complex, legalistic language, *Williams v. Walker-Thomas Furniture Company*, 121 U.S.App. D.C. 315, 350 F.2d 445 (D.C.Cir. 1965); disparity in sophistication of parties, *Industralease Automated & Scientific Equipment Corp. v. R. M. E. Enterprises, Inc.*, 58 A.D.2d 482, 396 N.Y.S.2d 427 (1977); and lack of opportunity to study the contract and inquire about contract terms, *Educational Beneficial, Inc. v. Reynolds*, 67 Misc.2d 739, 324 N.Y.S.2d 813 (1971). A lack of voluntariness is demonstrated in contracts of adhesion when there is a great imbalance in the parties' relative bargaining power, the stronger party's terms are unnegotiable, and the weaker party is prevented by market factors, timing or other pressures from being able to contract with another party on more favorable terms or to refrain from contracting at all. *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960); *Industralease Automated & Scientific Corp. v. R. M. E. Enterprises, Inc.*, supra.

■ Substantive unconscionability is found when the terms of the contract are of such an oppressive character as to be unconscionable. It is present when there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach, *United States Leasing Corporation v. Franklin Plaza Apartments, Inc.*, 65 Misc.2d 1082, 319 N.Y.S.2d 531 (1971); a large disparity between the cost and price or a price far in excess of that prevailing in the market price, *Hume v. United States*, 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889); or terms which bear no reasonable relationship to business risks assumed by the parties, *Denkin v. Sterner*, 1 UCC Rep.Serv. 173 (1956).

All of these concepts are applicable to leases in particular and all contracts in general. *Montgomery Ward & Co. v. Annuity Board of Southern Baptist Convention*, 16 Wash.App. 439, 556 P.2d 552 (1976).

In *Williams v. Walker-Thomas Furniture Company*, 121 U.S.App.D.C. 315, 350 F.2d 445 (6th Cir. 1965), the court said:

Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases, the meaningfulness of the choice is negated by a gross inequality of bargaining power. The manner in which the contract was entered is also relevant to this consideration. Did the party to the contract, considering his obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices? Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of the terms, it is hardly likely that his consent, was ever given to all the terms. In such a case the usual rule that the terms of the agreement are not to be questioned should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld.

Likewise, in *Fairfield Lease Corp. v. Umberto*, 7 UCC Rep.Serv. 1181, the court declared unconscionable a lease of a coffee machine which gave the lessor the right to accelerate payment of all rent, whether accrued or unaccrued, upon the lessee's failure to perform any term of the lease. The court noted that the printed lease agreement was drafted by the plaintiff's assignor and not changed in the least by the defendant, and then went on to say:

It does not appear that there was a definite or understandable reading by the defendant's son or his father of the printed agreement relating to defaults, if any

were to occur, and the effects thereof. This Court is not satisfied that the parties dealt 'upon a plane of equality by reason of the strength of the superior knowledge of one and the weakness . . . of the other'.

In the case of *Weaver v. American Oil Company*, 257 Ind. 458, 276 N.E.2d 144 (1971), the court declared unconscionable the clauses in a service station lease which exculpated the oil company from any liability for its negligence, stating that "[t]he party seeking to enforce such a contract has the burden of showing that the provisions were explained to the other party and came to his knowledge and there was in fact a real and voluntary meeting of the minds and not merely an objective meeting." Finally, in *Campbell Soup Company v. Wentz*, 172 F.2d 80 (3rd Cir. 1948), the court found that the agreement between Campbell Soup and its contract growers was unconscionable, because the contract was quite obviously drawn by skillful draftsmen with the buyer's interest in mind, using this language:

> We are not suggesting that the contract is illegal. Nor are we suggesting any excuse for the grower in this case who has deliberately broken an agreement entered into with Campbell. We do think, however, that a party who has offered and succeeded in getting an agreement as tough as this one is, should not come to a chancellor and ask [the] court help in enforcement of its terms. That equity does not enforce unconscionable bargains is too well established to require elaborate citations. . . . All we say is that the sum total of its provisions drives too hard a bargain for a court of conscience to assist.

■ This is exactly the situation in the case at bar. It is hard to conceive of a "tougher" agreement than the one Erwin drew for the Holyfields to sign. As the plaintiff's witness Tenney said, the plaintiff was not obligated to do anything under the lease but advance the money to purchase the cows. Tenney also admitted that once this was done, Goodwin had nothing more to do other than collect the payments, and the entire risk of loss fell on the Holyfields. As the Court has noted above, if all of the cows were killed the day after the Holyfields got them, through no fault of the defendants the Holyfields would have been liable for the entire lease amount. The tremendous return the plaintiff received on its investment, the lengthy and complex form of the lease, the disproportionate risk borne by the defendants—all combine to make this lease, as the court in the *Campbell Soup* case said, "too hard a bargain for a court of conscience to assist."

This Court is influenced here by exactly the same factors found by the court in *Weaver v. American Oil Company, supra.* Mr. and Mrs. Holyfield have limited business education, especially when compared with that of the plaintiff. Mr. Holyfield did not read the lease before he signed it, and in fact there was no opportunity to do so at the time it was presented. The clauses in the lease were never explained to him prior to the time that he signed it. Unquestionably, the plaintiff is in a superior bargaining position than the defendants, especially in light of the unstable financial position the Holyfields were in when they executed this lease, and the lease was not presented to them as being negotiable in any of its terms, but rather on a "take-it-or-leave-it" basis. Finally, the Court is influenced by the somewhat *sub rosa* manner in which the plaintiff operated through its broker and his employee, Erwin and Colebank, and the failure of the plaintiff to obtain adequate insurance for these cows. In this connection the Court notes that insurance in the amount of $500 per cow was obtained, when the cows cost $700 apiece; therefore, the plaintiff obviously was deficient in performing this obligation it did have under the lease.

The Court has analyzed the terms of this lease and finds that it is too one-sided to be found conscionable, especially since the Holyfields were obligated to continue making the lease payments even if the leased cows were destroyed through no fault of theirs, as was the case here. Therefore, pursuant

to the discretion conferred by Miss.Code Ann. § 75–2–302, this Court refuses to enforce the remainder of this contract, and the plaintiff will recover nothing from the defendants.

A Final Judgment, incorporating the holding of this Memorandum Opinion and approved as to form by counsel for all parties, shall be submitted within the time and in the manner provided for in the Local Rules.