966 So.2d 220 (2007)
COMMUNITY CARE CENTER OF VICKSBURG, LLC d/b/a Heritage House Nursing and Rehabilitation Center and Legacy Healthcare Services, Inc., Appellants
v.
Carolyn C. MASON, Appellee.
No. 2006-CA-00599-COA.
Court of Appeals of Mississippi.
October 9, 2007.
*222 Marjorie S. Busching, S. Mark Wann, Jackson, attorneys for appellants.
Henry Dean Andrews, attorney for appellee.
Before KING, C.J., GRIFFIS and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. Community Care Center of Vicksburg, LLC d/b/a Heritage House Nursing and Rehabilitation Center and Legacy Healthcare Services, Inc., appeal the judgment of the Circuit Court of Warren County, which denied the Appellants' motion to dismiss and compel arbitration. We find the trial court erred and thus reverse and remand this case for an order compelling arbitration.

STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. On April 18, 2003, Carolyn Mason admitted herself into the Heritage House Nursing and Rehabilitation Center ("Heritage House") in Vicksburg, Mississippi as a private-pay patient. Previously, Mrs. Mason had resided at her home in Vicksburg, where she was cared for by home health personnel as well as private-duty sitters. Mrs. Mason has cerebral palsy and was approximately sixty-nine years old at the time she entered Heritage House. According to medical records, Mrs. Mason had been hospitalized from February 8, 2003 to February 14, 2003 for viral gastroenteritis. Also, her husband had passed away in February.[1] In April of 2003, according to home health care personnel records, Mrs. Mason was ambulating and eating well. Then, on April 17, 2003, she tripped and fell in her home *223 when her robe became caught on a door. That evening, Mrs. Mason told her private-duty sitter, Faith Bunch, that she felt fine. However, when Bunch returned the next morning, Mrs. Mason's arm was swollen and bruised. Initially, Mrs. Mason requested Bunch take her to Heritage House, which Mrs. Mason had inquired about at an earlier time. Instead, Bunch took Mrs. Mason to her primary care physician, where Mrs. Mason was diagnosed with a fractured wrist. Then, Bunch took her to Heritage House, where she remained with Mrs. Mason during the admissions process. Once Mrs. Mason was situated in a room, Bunch noted in her records she "seem[ed] to be content."
¶ 3. On the day of her admission of April 18, 2003, Mrs. Mason signed numerous admission documents in her room. One such document was an admission agreement, which contained an arbitration provision. The seven page admission agreement was properly executed by Mrs. Mason on page six. Directly above her signature on this page, in bold-faced and all capital letters, it states:
ANY RESPONSIBLE PARTY OR PARTIES EXECUTING THIS AGREEMENT REPRESENT AND WARRANT THAT THEY HAVE AUTHORITY, EITHER EXPRESS, IMPLIED OR APPARENT, TO ACT AS AGENT FOR THE RESIDENT AND TO EXECUTE THIS AGREEMENT ON RESIDENT'S BEHALF.
On the next page, Mrs. Mason executed the agreement again, after the following statement in all capital letters and bold faced font:
THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTOOD THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION AND HAS RECEIVED A COPY OF THIS AGREEMENT, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO AND ACCEPTS ALL OF ITS TERMS.
The signature was witnessed by "D. Rogers," who is a social worker at Heritage House. Below this area is a section entitled "Witness Acknowledgment (to be executed when agreement signed by resident)." Here there was a place for the resident and a witness to sign. This area was not filled out or signed; however, the requisite signatures of the resident and witness were placed in the area above it.
¶ 4. Mrs. Mason did not, however, initial the top of page five of the agreement dealing with the arbitration provision. At the top of this page, a line was provided for initials, followed by the statement "ARBITRATION-PLEASE READ CAREFULLY." This page of the agreement contained the arbitration provision, explaining that any legal dispute which might arise "shall be resolved exclusively by binding arbitration." Further, continuing on page six, the arbitration agreement specifically informed the signatory that:
The Resident and/or Responsible Party understand that (1) he/she has the right to seek legal counsel concerning this agreement, (2) the execution of this Arbitration is not a precondition to the furnishing of services to the Resident by the Facility, and (3) this Arbitration Agreement may be rescinded by written notice to the Facility from the Resident within 30 days of signature.
There is no evidence that Mrs. Mason altered any part of the contract or rejected any of its provisions. Also, according to the record, Mrs. Mason did not present a power of attorney at any point during her stay at Heritage House or indicate that any person possessed legal authority over her.
*224 ¶ 5. Mrs. Mason resided at Heritage House until April 26, 2003, when an incident occurred. She alleges she was attacked by another resident while alone in her room. During the incident, Mrs. Mason fell, apparently trying to escape from the resident. She was taken to a hospital and diagnosed with a fractured hip. Then, on May 14, 2003, Mrs. Mason admitted herself to Shady Lawn Nursing Home. According to those admission documents, Mrs. Mason again was her own responsible party and indicated that on the advance directives form she did not have a power of attorney.
¶ 6. On May 6, 2004, Mrs. Mason filed suit against Community Care Center of Vicksburg d/b/a Heritage House in the Circuit Court of Warren County.[2] Mrs. Mason alleged negligence, negligence per se, premise liability, and gross negligence pertaining to the incident that occurred on April 26. Heritage House filed its answer and defenses, including a motion to compel arbitration. In her response to the motion to compel, Mrs. Mason submitted two affidavits: one by her and one by her sitter Faith Bunch. In Bunch's affidavit, she states she did not remember the term "arbitration" being discussed with Mrs. Mason, she does not know what the term means, and the facility representative "did not go into a lot of detail about what each document meant." In Mrs. Mason's affidavit, she states, upon admission to Heritage House she was handed a large stack of documents to sign without much explanation as to the meaning of each document. She also asserts at the time she was recovering from influenza which resulted in pneumonia and thus her condition was weak.[3] Therefore, she alleges she "was not as mentally alert as [she] would have been had [she] not been ill." Mrs. Mason also states in her sworn statement that the representative did not mention the term "arbitration," Mrs. Mason does not know what it means, she did not willfully or knowingly agree to any arbitration agreement, and she does not know what she signed that day.
¶ 7. The trial judge delayed ruling on the motion to compel arbitration in order to seek guidance from the Mississippi Supreme Court's pending opinion of Vicksburg Partners, L.P. v. Stephens, 911 So.2d 507 (Miss.2005). Once the opinion was released, the circuit court entered an order denying the Appellants' motion to compel arbitration, finding the arbitration clause on the admissions agreement procedurally and substantively unconscionable. In part, the circuit court based its decision on the fact
[t]he admission document that contained the arbitration clause did not have the initials of the Plaintiff in the designated area indicating that she had been informed of the arbitration clause and knew what it meant. The line is blank with no initials of the Plaintiff or anyone else. The admissions agreement lacks also all the necessary signatures of attesting witnesses.
Additionally, the order states that Mrs. Mason "had previously given power of attorney to Attorney Charles Mitchell, to handle her legal affairs, when she was unable to do so. Mr. Mitchell was not present with the Plaintiff at the time of her admission to the Defendant's facility, nor was he consulted during the admission *225 process."[4] The Appellants now appeal.

STANDARD OF REVIEW
¶ 8. We apply a de novo standard of review regarding a decision to grant or deny a motion to compel arbitration. EquiFirst Corp. v. Jackson, 920 So.2d 458, 461(¶ 9) (Miss.2006) (citing Doleac v. Real Estate Professionals, LLC, 911 So.2d 496, 501(¶ 16) (Miss.2005)). The Mississippi Supreme Court has recognized that "arbitration is favored and firmly embedded in both our federal and state laws." Vicksburg Partners, 911 So.2d at 513(¶ 10) (citing Pass Termite & Pest Control, Inc. v. Walker, 904 So.2d 1030, 1032-33(¶ 7) (Miss.2004)).

ANALYSIS
¶ 9. The trial court found that the arbitration clause at issue was procedurally and substantively unconscionable and thus denied the Appellants' motion to compel arbitration. On appeal, the Appellants raise the issue of whether an individual, acting in her own capacity, can avoid the terms of an arbitration provision contained in a nursing home admission agreement which she signed when no exigent circumstances have been evidenced or available defenses proven under Mississippi contract law. We find that she cannot and determine that the trial court erred in finding the arbitration agreement unconscionable.
¶ 10. The Mississippi Supreme Court has held that arbitration provisions within a nursing home admission agreement fall within the scope of the Federal Arbitration Act ("FAA"). Vicksburg Partners, 911 So.2d at 515(¶ 16). The FAA provides that arbitration agreements shall be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." East Ford, Inc. v. Taylor, 826 So.2d 709, 713(¶ 11) (Miss. 2002) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). In order to determine the validity of a motion to compel arbitration under the FAA, there is a "two-pronged inquiry" by the court. East Ford, 826 So.2d at 713(¶ 9). The first prong has two parts: "(1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement." Id. The second prong asks "whether legal constraints external to the parties' agreement foreclosed arbitration of those claims." Id. at 713(¶ 10) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). Under the second prong, in order to determine whether external legal constraints exist which would preclude arbitration, courts should generally apply ordinary state-law principles that govern contract formation. Id. at 713-14(¶ 12) (quoting *226 Bank One, N.A. v. Coates, 125 F.Supp.2d 819, 827 (S.D.Miss.2001)). Thus, only the usual contract defenses "such as fraud, duress, or unconscionability, can be used to invalidate arbitration provisions." Vicksburg Partners, 911 So.2d at 514(¶ 11) (citing Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)).
¶ 11. In our case, it is under East Ford's second prong that the trial court found the arbitration agreement invalid due to unconscionability. However, since our standard of review is de novo, our analysis shall cover both prongs of the East Ford test to determine the validity of the Appellants' motion to compel arbitration.
1. The First-Prong of the East Ford Test.
A. Whether a valid arbitration agreement existed between Mrs. Mason and Heritage House.
¶ 12. The first part of the first prong of the East Ford test inquires as to whether there is a valid arbitration agreement. East Ford, 826 So.2d at 713(¶ 9). In our case, the arbitration provision at issue begins on page five of the admission agreement and continues to page six. The top of page five reads: "ARBITRATION-PLEASE READ CAREFULLY," and a line extends to the right for the reader to sign her initials that she has done so. This is the only area on this page for Mrs. Mason to sign or initial. It is undisputed that Mrs. Mason did not sign her initials here. At the bottom of the next page, page six, Mrs. Mason did write and sign her name three times regarding authorization for release of medical records and acknowledging that she had been explained her rights. At the very bottom of page six, under these signatures, is the following statement in bold:
THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTOOD THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION AND HAS RECEIVED A COPY OF THIS AGREEMENT, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO AND ACCEPTS ALL OF ITS TERMS.
Finally, at the top of page seven, Mrs. Mason's signature appears, as does D. Rogers's signature twice, as facility representative and witness. These signatures, however, are on the wrong lines. Mrs. Mason's signature is in the "Facility Representative" line, but that title is marked out and corrected with "Resident." Likewise, D. Rogers's signature is on the resident's line, with that title marked out and corrected with "Facility Rep." There is a signature line for the "Responsible Party" which is appropriately blank, as Mrs. Mason was her own responsible party. On this page there is also a "witness acknowledgment" to be executed when the agreement is signed by the resident, but this area is blank.
¶ 13. Although at the trial court level Mrs. Mason argued exigent circumstances in the situation surrounding the execution of the admission agreement, which would point towards procedural unconscionability, she now argues that the elements of a contract are not present. Mrs. Mason states that the mere presence of arbitration language is not conclusive as to enforceability, citing Vicksburg Partners, 911 So.2d at 525(¶ 49).[5] Interestingly, Vicksburg *227 Partners found a valid arbitration agreement, and that it was enforceable. Id. at 522(¶ 39). Mrs. Mason does not provide any evidence that there is not a contract except that the arbitration clause is not initialed and the acknowledgment signatures are out of place. We do not find the admission agreement invalid because of these matters.
¶ 14. The Appellants argue that Mrs. Mason's failure to initial after the words "PLEASE READ CAREFULLY" regarding the arbitration section does not mean she rejected the arbitration provision and is not dispositive in invalidating the entire admissions agreement. We agree. Noteably, she executed the agreement on page six and again on page seven, where her signature was acknowledged and witnessed. Moreover, Mrs. Mason did not make any notations indicating she revoked the admissions agreement or the arbitration provision. Also, as the Appellants note, in Mrs. Mason's affidavit, while she states arbitration was not mentioned during the admission process, she does not assert that her failure to initial this page was an intentional rejection of the arbitration provision.
¶ 15. Further bolstering their argument, the Appellants state that Mrs. Mason had a "duty to read and understand any document she signs. . . ." United Credit Corp. v. Hubbard, 905 So.2d 1176, 1178 (Miss.2004). We agree. "It is well settled under Mississippi law that a contracting party is under a legal obligation to read a contract before signing it." Terminix Int'l, Inc. v. Rice, 904 So.2d 1051, 1056(¶ 18) (Miss.2004) (citing McKenzie Check Advance of Miss., LLC v. Hardy, 866 So.2d 446, 455(¶ 30) (Miss.2004)). "[T]hat is, a party may neither neglect to become familiar with the terms and conditions and then later complain of lack of knowledge, nor avoid a written contract merely because he or she failed to read it or have someone else read and explain it." Miss. Credit Ctr. v. Horton, 926 So.2d 167, 176(¶ 31) (Miss.2006) (citing Titan Indem. Co. v. City of Brandon, 27 F.Supp.2d 693, 697 (S.D.Miss.1997)). A plaintiff may not escape the terms of the agreement merely by stating she did not read it or understand its terms. Id. Additionally, the record indicates Mrs. Mason was well educated and a retired school librarian.
¶ 16. Recently, the Mississippi Supreme Court issued an opinion on an admission agreement containing a similar arbitration provision in Bedford Care Center-Monroe Hall LLC v. Lewis, 923 So.2d 998 (Miss. 2006). In Lewis, the supreme court upheld the trial court's conclusion that because the conservator did not sign the arbitration provision, she could not be forced to arbitrate. Lewis, 923 So.2d at 1001(¶ 15). However, in Lewis, there was evidence in the record that the conservator made an express and knowledgeable decision not to sign the arbitration provision. Id. at 1002(¶ 16). The nursing home had added a highlighted signature line with the words "please sign" directly under the paragraph stating Lewis was waiving her right to a jury trial. Id. at 1000(¶ 11). Evidence showed Lewis purposefully did not sign here, although she did initial on a line to indicate she had read the arbitration provision, unlike the instant case. See id. at 1001 (¶ ¶ 14, 15). Further, Lewis's conservator was given two chances to sign the arbitration provision, as the nursing home sent the agreement back to her in the mail when it was not signed the first time. Id. at 1001-02 (¶ ¶ 14-16). In our case, until the motion to compel arbitration was filed, there was no evidence that Mrs. Mason made an express decision not to accept the terms of the arbitration agreement except for the fact she did not initial so as to indicate she had read the arbitration *228 provision. We do not find Lewis analogous to the instant case.
¶ 17. We find no authority in Mississippi courts that is instructive on failure to initial an agreement. Two opinions from other jurisdictions, however, are instructive on the effect of failing to initial a provision where there is a signature within a portion of the agreement. In Elsken v. Network Multi-Family Sec. Corp., 49 F.3d 1470 (10th Cir.1995), a murdered woman's estate administrator filed suit against a security alarm corporation alleging breach of contract and negligence, among other claims. Id. at 1472. The victim-plaintiff, Patricia Elsken, in an unsuccessful attempt to rent an apartment in a safe area, had contracted for a twenty-four hour alarm system from the defendant-corporation at the same time she signed her rental lease. The services agreement contained an indemnity clause and limitation of liability clause. Although Elsken signed the contract, she did not initial the reverse side of the services agreement where the limitation of liability clause was located. Elsken's signature of the agreement was placed directly below a provision referencing the limitation of liability claim. Elsken argued that because she did not initial the limitation of liability clause, it was not in effect because she did not agree to it. Id. at 1474. Further, Elsken argued that the contract could not be enforced because she did not read it. The circuit court rejected these contentions, finding that the contract itself, which Elsken signed, advised her of the terms on the back page of the agreement. Also, Oklahoma authority states failure to read a contract does not "avoid its legal effect." The Elsken court found the signature directly above a reference to the provision meant she agreed to the contract in its entirety, including the limitation of liability clause which she failed to initial. Id. We find this analysis persuasive. As in Elsken, the plaintiff's signature in the instant case is directly below a provision which references the clause sought to be enforced. Further, as previously discussed, Mississippi law requires a contracting party to read a contract before signing it.
¶ 18. A second case we find instructive is the California state court case of Basura v. U.S. Home Corp., 98 Cal.App.4th 1205, 120 Cal.Rptr.2d 328 (2002), a design and construction defect action wherein the defendant-builder failed to initial an arbitration paragraph in twenty-eight of forty-eight form contracts that had a space for both the buyers' and the sellers' initials in order to make the arbitration clause a part of the contract. Id. at 330. All of the plaintiff-buyers initialed the provision. Id. The trial court denied the defendant's motion to compel arbitration. Id. at 329. The plaintiff-buyers argued that the arbitration clause was not enforceable because the defendant-builder had failed to initial it in twenty-eight contracts. Id. at 331. The appellate court found the failure to initial was not dispositive of the intent to arbitrate and remanded the case to determine whether the defendant intended to be bound by arbitration. Id.
¶ 19. In our case, we too find failure to initial the agreement not dispositive. Rather than remanding for a hearing on the parties' intent, however, we look to the affidavit executed by Mrs. Mason. The affidavit does not indicate that her failure to initial was an intentional rejection of the arbitration agreement. Although Mrs. Mason does not admit she did not read the arbitration clause, she states she has no recollection that an arbitration agreement was included in the documents she signed. The arbitration provision is, however, prominently displayed in the contract, and a reference to it appears in all capital, bold letters immediately before Mrs. Mason's signature. We equate the statements *229 made in the affidavit to be much more akin to an acknowledgment that Mrs. Mason did not read the provision than to a claim she intentionally rejected it.
¶ 20. The evidence points to a valid arbitration provision between Mrs. Mason and Heritage House and that she intended to be bound by arbitration. We do not find her failure to initial the arbitration provision invalidates the arbitration agreement or the contract as a whole. Nor do we find that the misplaced signatures on the last page of the agreement invalidate it. There is no evidence of an intent to invalidate the arbitration agreement. Therefore, we find there was a valid arbitration agreement between Mrs. Mason and Heritage House.
B. Whether Mrs. Mason and Heritage House's dispute is within the scope of the arbitration agreement.
¶ 21. The second part of the East Ford first prong inquires as to whether the dispute is within the scope of the arbitration agreement. East Ford, 826 So.2d at 713(¶ 9). Mrs. Mason sued for negligence, among other claims, in her complaint against the Appellants. The arbitration provision in the admissions agreement clearly provides that any legal dispute "shall be resolved exclusively by binding arbitration . . . and not by a lawsuit. . . ." Clearly, the dispute is within the arbitration agreement's scope.
¶ 22. Thus, we find both parts of the first prong of the East Ford test satisfied.
2. The Second Prong of the East Ford test.
¶ 23. The second prong of the East Ford test asks us to determine whether there are any legal constraints, such as valid contractual defenses, which would preclude arbitration. East Ford, 826 So.2d at 713(¶ 10). In her brief, Mrs. Mason concedes the defenses of duress and fraud are not present. The trial court, however, found the arbitration agreement both procedurally and substantively unconscionable; therefore, we shall discuss both types of unconscionability.
A. Procedural Unconscionability.
¶ 24. "Procedural unconscionability may be proved by showing `a lack of knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in sophistication or bargaining power of the parties and/or a lack of opportunity to study the contract and inquire about the contract terms.'" East Ford, 826 So.2d at 714(¶ 13) (citing Pridgen v. Green Tree Fin. Servicing Corp., 88 F.Supp.2d 655, 657 (S.D.Miss. 2000)). "Procedural unconscionability looks beyond the substantive terms which specifically define a contract and focuses on the circumstances surrounding a contract's formation." Vicksburg Partners, 911 So.2d at 517(¶ 24) (citing Black's Law Dictionary 1524 (6th ed.1990)).
¶ 25. The basis of Mrs. Mason's argument concerning procedural unconscionability is that she did not willingly, knowingly, and voluntarily entered into the arbitration provision. See Vicksburg Partners, 911 So.2d at 525-26(¶ 49). However, Mrs. Mason concedes the separate, but related contractual defenses of duress and fraud are not present. Seemingly, this would lead only one remaining aspect  lack of knowledge  to procedural unconscionability, which has already been at least partially discussed in relation to finding a valid arbitration agreement. Since we are reversing the trial court's decision, though, we shall discuss all possible elements of procedural unconscionability.
*230 ¶ 26. As far as the format, we find the layout of the arbitration agreement to be clear and conspicuous, with non-legalistic language used. Further, Mrs. Mason was familiar with the admissions process, as she had admitted herself and her husband to another nursing home previously and approved of the arbitration agreement in that admission agreement.
¶ 27. The argument that Mrs. Mason did not know or understand what she was signing at the time is untenable. Her failure to initial that she carefully read the arbitration section does not establish a lack of knowledge. If Mrs. Mason had read what she signed, which she had a duty to do, there was sufficient evidence of notice of intent to arbitrate within the contract. Heritage House did not have the duty to explain every term of the admission agreement to Mrs. Mason.
¶ 28. Relatedly, all of the documents Mrs. Mason signed at Heritage House indicated she was her own responsible party. According to the record, Mrs. Mason did not present a power of attorney or represent that any person possessed legal authority over her at any point during her stay at Heritage House. There is no evidence in the record that Mrs. Mason had a power of attorney prior to her admission to Heritage House in April 2003. Further, no attorney contacted the facility on Mrs. Mason's behalf during her stay, nor was there ever an attempt at formal rescission of the arbitration agreement at any time prior to the filing of the Appellants' motion to compel.
¶ 29. Regarding exigent circumstances, the supreme court "save[d] for another day the resolution of a case [where] that factual scenario" could impact the validity of arbitration provisions. Vicksburg Partners, 911 So.2d at 525(¶ 49). The court explained that while there may be situations where the "need for immediate health care" might require the patient to choose between "forever waiving available remedies in a judicial forum, or forgoing necessary medical treatment," that was not the factual scenario in Vicksburg Partners. Id. Exigent circumstances were not present in our case, either, when Mrs. Mason admitted herself to Heritage House. Medical professionals treated her wrist before she decided to admit herself to Heritage House for recuperation  an option she had considered and done previously at a different nursing home. We find no evidence in the record to suggest that Mrs. Mason was in any type of exigent physical or mental distress at the time of her admission. While evidence would support that she may have been in a generalized weakened physical state from events in the months prior such as her husband passing away and viral gastroenteritis, this condition would not appear to affect her ability to read, understand, and sign a contract. Nor is there any evidence of mental incapacity. In her affidavit, Mrs. Mason notes when executing the contracts she was not as mentally alert because of her weakened physical state. Yet, we cannot find evidence to suggest her mental state made the execution of the documents procedurally unconscionable.
¶ 30. As in Vicksburg Partners, we find the signing of the admission agreement, including the arbitration agreement, was willingly, knowingly, and voluntarily entered into by Mrs. Mason. We find no evidence of procedural unconscionability.
B. Substantive Unconscionability.
¶ 31. "Substantive unconscionability may be proven by showing the terms of the arbitration agreement [clause] to be oppressive." Vicksburg Partners, 911 So.2d at 521(¶ 35) (quoting East Ford, 826 So.2d at 714). An example of substantive unconscionability is "when there is a *231 one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach." Id. (citing Bank of Ind. v. Holyfield, 476 F.Supp. 104, 110 (S.D.Miss.1979)). Vicksburg Partners directs us to look to the four corners of the agreement in order to find abuses within specific terms of the agreement which would "violate the expectations of, or cause gross disparity between, contracting parties." Vicksburg Partners, 911 So.2d at 521(¶ 35).
¶ 32. In our case, the arbitration provision specifically states:
It is understood and agreed by the facility and resident and/or responsible party, that any legal dispute, controversy, demand or claim . . . that arises out of or related to the admission agreement or any services or health care provided by the Facility to the Resident shall be resolved exclusively by binding arbitration.
We do not find the terms of the arbitration provision oppressive. Each party had the right to demand and enforce the same remedy of arbitration. Either party could terminate the entire contract upon thirty days' written notice. Furthermore, the resident could rescind the arbitration agreement within thirty days of execution. The arbitration provision specifically states Mrs. Mason had the right to seek legal counsel concerning the agreement, but she chose not to and did not have the documents sent to an attorney for review. We find no evidence Mrs. Mason was deprived of any benefits without a remedy or that Heritage House had an advantage over Mrs. Mason because of the language in the arbitration provision.
¶ 33. Regarding contracts containing arbitration provisions, the supreme court stated "[a]rbitration is about choice of forum-period." Vicksburg Partners, 911 So.2d at 525(¶ 49). Arbitration merely means both parties have a mutually agreed upon forum through which to pursue their claims. Thus, we find no substantive unconscionability within the terms of the arbitration provision.

CONCLUSION
¶ 34. We find a valid arbitration agreement was executed between Mrs. Mason and Heritage House. Procedural or substantive unconscionability, contractual defenses which would preclude affirmance of a motion to compel arbitration, are absent. Accordingly, we reverse the circuit court's order denying the Appellants' motion to compel arbitration and remand this case to the Circuit Court of Warren County for action consistent with this opinion.
¶ 35. THE JUDGMENT OF THE CIRCUIT COURT OF WARREN COUNTY IS REVERSED AND REMANDED FOR AN ORDER COMPELLING ARBITRATION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
LEE, P.J., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. KING, C.J., CONCURS IN RESULT ONLY. MYERS, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
NOTES
[1] Mrs. Mason and her husband had previously been temporary residents at another nursing home in Vicksburg, Shady Lawn, from November 2002 to January 2003.
[2] Later, Legacy Healthcare Services, Inc. was joined as a party to this action.
[3] However, there are no medical records in the appellate record to substantiate these illnesses beyond the hospitalization for viral gastroenteritis in February 2003.
[4] We note the trial court's order discusses a fact not present in the record, except as representations by Mrs. Mason's counsel, that Mrs. Mason gave Charlie Mitchell power of attorney over her legal affairs prior to the incidents of this case. On the admission forms to Shady Lawn Nursing Home in November 2002, as well as May 2003, "Charlie Mitchell" is listed merely as a "friend." It was not until Mrs. Mason's latest admission to Shady Lawn in August 2004 that Mitchell is designated as a "responsible party" on the admissions forms. Further, on Shady Lawn's "no code/ DNR" consent form, it specifically states that Mitchell does not have power of attorney unless Mrs. Mason's physician certifies she cannot decide for herself. This document appears to be dated April 2005.
[5] The trial court awaited this opinion's hand down from the supreme court for guidance before making its ruling.