# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-00169-SCT

*GRENADA LIVING CENTER, LLC, COMMUNITY CARE CENTER OF GRENADA, LLC, COMM CARE MISSISSIPPI, JAMES S. WILLIAMS AND JAMES C. LANDERS*

*v.*

*CEPHUS COLEMAN, III (SUBSTITUTED FOR ANNE DONALDSON), AS PERSONAL REPRESENTATIVE OF CEPHUS COLEMAN, JR., DECEASED AND ON BEHALF OF THE WRONGFUL DEATH BENEFICIARIES OF CEPHUS COLEMAN, JR., DECEASED*


| | |
|---|---|
| DATE OF JUDGMENT: | 01/06/2006 |
| TRIAL JUDGE: | HON. C. E. MORGAN, III |
| COURT FROM WHICH APPEALED | GRENADA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | STEVEN MARK WANN |
| | MARJORIE SELBY BUSCHING |
| ATTORNEYS FOR APPELLEE: | CHARLES E. GIBSON, III |
| | GIGI GIBSON |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 07/26/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**DIAZ, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    This case addresses when a person is subject to the Uniform Healthcare Decisions Act and when a non-signatory is subject to arbitration.

**Facts and Proceedings Below**

¶2.    Cephus Coleman, Jr. was a World War II veteran, paralyzed since eighteen from a wound suffered in battle. In a wheelchair since his service days, he earned a college degree, married, had a child, and served as pastor to a church. In 2003, well into his seventies, Mr. Coleman was living with his half-sister, Anne Donaldson. She needed help caring for him, and sought a nursing home who would accept the Veterans Administration benefits Cephus received. Grenada Living Center accepted the VA benefits, and Anne took steps to have Mr. Coleman become a resident.

¶3.    In July of 2003 Mr. Coleman became a resident of Grenada Living Center, and he passed away on January 22, 2004, while still a resident. After his death, a suit was filed by Cephus' son, Cephus Coleman, III, against the nursing home, which responded with the now-familiar motion to dismiss in favor of arbitration.[1] Anne signed the contract for admission and placed her initials by the arbitration agreement. Coleman, wishing to avoid arbitration, argued that his father was never a party to the arbitration agreement and therefore could not have been bound by it.

¶4.    At a hearing before the trial, the parties stipulated to several facts which are critical to our analysis.[2] First, it was agreed that when Mr. Coleman was mentally competent when his half-sister had him placed in the nursing home. Second, Mr. Coleman was not present when Anne signed the admission agreement and the arbitration agreement. Third, Anne is Mr. Coleman's half-sister who did not retain power of attorney, a conservatorship, a

_____

[1]Pursuant to 9 U.S.C. § 3, a movant should file a motion to stay proceedings contemporaneously with the motion to compel arbitration.

[2]The facts relied upon are those stipulated to by the parties at the second hearing before the trial court.

guardianship, or any other legal power over her half-brother. Mr. Coleman later executed a power of attorney in favor of his half-sister that the parties agreed was not retroactive.

¶5. The memoranda of the parties in the trial court and the hearings before the Grenada County Circuit Court focused on the issues on which many arbitration cases often turn, such as whether there was duress in the entering of the contract and if the agreement was unconscionable. After a review of two memoranda, multiple exhibits, and two hearings on the subject, the trial court issued a narrow ruling based on basic contract law: that, generally speaking, a contract is not enforceable against a person unless personally entered into. Accordingly, the trial court found that no contract existed and Mr. Coleman was not bound by arbitration.

¶6. Aggrieved, Grenada Living Center appeals, presenting us with one question on appeal: Is a competent person who was not a signatory to a contract bound by an arbitration clause contained within that contract?

**Standard of Review**

¶7. "The grant or denial of a motion to compel arbitration is reviewed de novo." *East Ford, Inc. v. Taylor*, 826 So. 2d 709, 713 (Miss. 2002). We have previously ruled that lawsuits involving negligence at a nursing home affects interstate commerce, thus invoking the Federal Arbitration Act. *Vicksburg Partners*, 911 So. 2d at 515-16.

¶8. The FAA requires a two-step inquiry when scrutinizing an arbitration agreement. *East Ford*, 826 So. 2d at 713. First, we must determine if the parties intended to arbitrate the dispute; if so, we next consider "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Mitsubishi Motors Corp. v. Soler*

3

***Chrysler-Plymouth***, 473 U.S. 614, 628 (1985); ***East Ford*** at 826 So. 2d at 713. "Under the second prong, applicable contract defenses available under state contract law such as fraud, duress, and unconscionability may be asserted to invalidate the arbitration agreement without offending the Federal Arbitration Act." ***Id.*** at 713; *see* 9 U.S.C. § 2 (an "agreement in writing to submit to arbitration an existing controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract").

**Discussion**

¶9.     To determine if the parties are bound by arbitration, in this case we must first determine if a contract exists between them. A valid contract must have (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation. ***Rotenberry v. Hooker***, 864 So. 2d 266, 270 (Miss. 2003). In this case we focus on the fourth and fifth factors—whether the parties who executed the contract had the legal ability to create the contract or assent to the contract.

¶10.     Coleman asserts that Anne could not legally bind his father to arbitration because he was not a party to the contract. In response, Grenada Living Center offers four reasons why arbitration applies.

¶11.     Grenada Living Center asserts that Anne acted as Cephus' healthcare surrogate, citing to the Uniform Healthcare Decisions Act. *See* Miss. Code Ann. § 41-41-203 *et seq*. (Rev. 2005). This argument was never raised before the trial court in any fashion. We have "repeatedly held that a trial judge will not be found in error on a matter not presented to the

4

trial court for a decision." ***Purvis v. Barnes***, 791 So. 2d 199, 203 (Miss. 2001). Accordingly, this issue is procedurally barred.

¶12.    Notwithstanding this procedural bar, we will briefly examine the plain language of the statute for the sake of guidance. Section 1 of the statute defines the requirements for any person who wishes to be a surrogate. There are two pre-conditions: "A surrogate may make a health-care decision for a patient who is an adult or emancipated minor ***if*** [1] the patient has been determined by the primary physician to lack capacity and [2] no agent or guardian has been appointed or the agent or guardian is not reasonably available." Miss. Code Ann. § 41-41-211(Rev. 2005) (emphasis added). Therefore, a close reading of the statute reveals that a prerequisite before any other analysis is that a patient may only have a surrogate if they do not have mental capacity to make decisions and they do not have any other person legally available to care for them. Sections 2 and 3 of the statute define who may be a surrogate, but the preconditions of Section 1 must first be met.

¶13.    In the case at hand, the parties stipulated that Mr. Coleman was competent, and no physician had declared him incompetent. In addition, no agent or guardian had been appointed, and so the first pre-requisite of Section 1 was not met. Accordingly, Mr. Coleman's half-sister Anne could not have been his health-care surrogate. Further, it is clear from the statute that the Legislature intended to create a system whereby a family member (or other *de facto* guardian) could tend to the health needs of a loved one when they were incapacitated. Because Mr. Coleman was not incapacitated, the statutes governing health care surrogates do not apply.

5

¶14. The nursing home also asserted that "neither Mississippi, nor Federal Law require a power of attorney, conservatorship, guardianship or other court-ordered legal authority to admit a resident to a nursing home." Grenada Living Center provided no citation of authority in this section. Accordingly, this argument is barred, as failure to cite any authority in support of a claim of error precludes this Court from considering the specific claim on appeal. *See Grey v. Grey*, 638 So. 2d 488, 491 (Miss. 1994).

¶15. Third, the nursing home argued that Anne's actions could bind Mr. Coleman through express agency, or in the alternative, implied agency. As noted above, Grenada Living Center stipulated before the trial court facts which undercut the theory of express agency, including stipulating that there was no express grant of agency through a guardianship, conservatorship, or power of attorney. The trial court found no basis for the nursing home to simply assume the presence of express agency. As to implied agency, this argument was never presented to the trial court and therefore is procedurally barred. *See Purvis*, 791 So. 2d at 203.

¶16. Fourth and last, Grenada Living Center asserts that the family of Cephus should be bound to the terms and conditions of the arbitration agreement in the contract. In support, it offers correctly that we have held that non-signatories may be bound by an arbitration agreement when they are third-party beneficiaries. *See Smith Barney, Inc. v. Henry*, 775 So. 2d 722, 727 (Miss. 2001) (finding that arbitration clause covered successor to will); *Terminix Intern., Inc. v. Rice*, 904 So. 2d 1051, 1058 (Miss. 2004) (wife bound by arbitration clause in contract signed by her husband despite the fact she did not sign).

¶17. Those cases remain binding precedent, and this case does not stand for the proposition that non-signatories to a contract containing an arbitration clause can never be bound by arbitration. Here, the trial court reasoned in accordance with the stipulations of the parties that "nobody had the authority to speak for Cephus Coleman, Jr. except himself," and therefore "there is no binding written contract between Cephus Coleman, Jr. and the nursing home requiring arbitration." We find this reasoning persuasive. Any wrongful death beneficiaries of Cephus can be bound only to the extent he would be bound. Because there was no contract between Cephus and the nursing home in the first place, no arbitration clause exists to be enforced against the wrongful death beneficiaries of Cephus.

**Conclusion**

¶18. The Uniform Healthcare Decisions Act does not apply to those persons who are competent. In addition, for our Court to review a case, the issues must first be presented to the trial court.[3] We cannot examine that which does not exist, and we must counsel parties not to "bootstrap" arguments or submit issues that are not properly before the Court. Accordingly, we affirm the judgment of the Grenada County Circuit Court denying arbitration.

¶19. **AFFIRMED.**

---

[3]With some notable exceptions. For instance, subject matter jurisdiction may be raised at any time, even for the first time on appeal. *See* M.R.A.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action or transfer the action to the court of proper jurisdiction"); *Comment*, M.R.A.P. 12 ("Under Rule 12(h)(3) a question of subject matter jurisdiction may be presented at any time . . . [and] may be presented for the first time on appeal").

**WALLER, P.J., CARLSON, GRAVES, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. SMITH, C.J., CONCURS IN RESULT ONLY. EASLEY, J., CONCURS IN PART AND IN RESULT. CARLSON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., WALLER, P. J., EASLEY, DICKINSON, RANDOLPH AND LAMAR, JJ.**

**CARLSON, JUSTICE, SPECIALLY CONCURRING:**

¶20.    While I unhesitatingly join my colleagues in the majority, I deem it necessary to go a little further concerning our discussion on arbitration.  While the majority acknowledges this Court's decisions in *Smith Barney, Inc. v. Henry*, 775 So. 2d 722, 727 (Miss. 2001) and *Terminix International, Inc. v. Rice*, 904 So. 2d 1051, 1058 (Miss. 2004), there is more to our history concerning arbitration cases.

¶21.    In *Parkerson v. Smith*, 817 So. 2d 529 (Miss. 2002), this Court held, *inter alia*, that a nonsignatory to a contract containing an arbitration clause, who was not even mentioned in the arbitration clause, could not gain the benefit of compelling arbitration.  *Id.* at 535. However, *Parkerson* generated four separate opinions.[4]  In the wake of the muddied waters created by *Parkerson*, this Court began a course of attempting to lay out with clarity when parties might or might not be bound by arbitration, beginning with *East Ford, Inc. v. Taylor*, 826 So. 2d 709 (Miss. 2002), and *Russell v. Performance Toyota, Inc.*, 826 So. 2d 719 (Miss. 2002).

---

[4]Presiding Justice McRae wrote the majority opinion, joined by Justices Diaz, Easley and Graves, and Justice Carlson concurred in result only.  Justice Diaz wrote a concurring opinion, joined by Presiding Justice McRae, and Justices Easley and Graves.  Justice Cobb wrote a dissenting opinion.  Chief Justice Pittman likewise wrote a separate opinion wherein he concurred in part, and dissented in part, and this opinion was joined by Justice Waller, and was joined in part by Justices Cobb and Carlson.  Presiding Justice Smith did not participate.

¶22. Without citing all our arbitration cases, and those of the Court of Appeals, which are by now legion, I focus only on a few of our cases where we have addressed the issue of nonsignatories in an arbitration setting. I start by citing this Court's decision in *Terminix International, Inc. v. Rice*, 904 So. 2d 1051, 1058 (Miss. 2004) (wife bound by arbitration clause in contract signed by her husband, although she did not sign the contract). In *B. C. Rogers Poultry, Inc. v. Wedgeworth*, 911 So. 2d 483, 491-92 (Miss. 2005), we stated:

> [S]tate law principles might provide for the arbitration of disputes between a nonsignatory and a signatory to a contract, where there are allegations of substantially interdependent and concerted misconduct. A non-signatory should have standing to compel arbitration where the non-signatory has a close legal relationship, such as, alter ego, parent/subsidiary, or agency relationship, with a signatory to the agreement. See *Terminix Int'l, Inc. v. Rice*, 904 So. 2d 1051 (Miss. 2004) (quoting *Washington Mut. Fin. Group, LLC v. Bailey*, 364 F. 3d 260, 267 (5th Cir. 2004) ("A nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency.") *See also Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F. 3d 753, 757 (11th Cir. 1993); *J. J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F. 2d 315 (4th Cir. 1988); *Interocean Ship. Co. v. Nat'l Ship. & Trading Corp.*, 523 F. 2d 527, 539 (2d Cir. 1975).

*Id.* at 491-92. *See also Fradella v. Seaberry*, 952 So. 2d 165, 175 (Miss. 2007) (nonsignatory to contract containing arbitration clause could compel arbitration against signatory where nonsignatory had certain specified rights and responsibilities to the signatory under the contract); *Adams v. Greenpoint Credit, LLC*, 943 So. 2d 703, 708 (Miss. 2006) ("arbitration agreements can be enforced against nonsignatories if such nonsignatory is a third party beneficiary" or if the doctrine of equitable estoppel applies);[5] *Cleveland v. Mann*, 942 So. 2d 108, 119 (Miss. 2006) (decedent's heirs-at-law in wrongful death action against

---

[5] In *Adams*, the nonsignatory was found not to be bound by the arbitration agreement. 943 So. 2d at 709.

medical providers bound by arbitration agreement signed by decedent); ***Sullivan v. Protex Weatherproofing, Inc.***, 913 So. 2d 256, 260-61 (Miss. 2005) (case involving a global transaction with several documents found to be integral to the overall transaction – nonsignatory could compel arbitration against a signatory).

¶23. This list is by no means all-inclusive. I could go on, but trusting that my point is made, I will stop. Hopefully, my learned colleagues in the majority will react to this separate opinion by stating that the cases I cite are clearly distinguishable from today's case. If that is their reaction, they would be absolutely correct – and that is my point. The cases I cite today are unquestionably distinguishable from the case *sub judice*, but I simply felt compelled to briefly discuss this Court's history in an area of the law that we have struggled mightily to clarify over the past five years.

¶24. With this having been said, I unhesitatingly fully concur in the majority's opinion based on the specific facts and circumstances peculiar to this particular case.

**SMITH, C.J., WALLER, P.J., EASLEY, DICKINSON, RANDOLPH AND LAMAR, JJ., JOIN THIS OPINION.**