# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00627-COA

**WILKINSON COUNTY SENIOR CARE, LLC, TREND CONSULTANTS, LLC AND CHARLES BRUCE KELLY**　　　　　　　　　　　　**APPELLANTS**

**v.**

**EDITH KIRKLAND, INDIVIDUALLY, AND ON BEHALF OF AND FOR THE USE AND BENEFIT OF THE WRONGFUL DEATH BENEFICIARIES OF MAGGIE GLIDEWELL**　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/31/2015 |
| TRIAL JUDGE: | HON. LILLIE BLACKMON SANDERS |
| COURT FROM WHICH APPEALED: | WILKINSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | JOSEPH SPENCER YOUNG JR. |
| ATTORNEYS FOR APPELLEE: | RICHARD PAUL WILLIAMS III |
| | COURTNEY MCREYNOLDS WILLIAMS |
| | DARYL MATTHEW NEWMAN |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | DENIED MOTION TO COMPEL ARBITRATION |
| DISPOSITION: | REVERSED AND REMANDED - 08/02/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., ISHEE AND WILSON, JJ.**

**ISHEE, J., FOR THE COURT**:

¶1.　Wilkinson County Senior Care (WCSC) appeals the judgment of the Wilkinson County Circuit Court denying WCSC's motion to compel a binding arbitration pursuant to terms in its admission agreement with its patient Maggie Glidewell. Finding error, we reverse and remand.

## FACTS

¶2.     Glidewell was admitted to WCSC on December 21, 2010.[1]  At the time of her admission, Glidewell's granddaughter, Angela Jones, acting with a valid power of attorney with healthcare provisions, signed an admission agreement on Glidewell's behalf.  The admission agreement also had a signatory line for a representative from WCSC to sign, but it remained blank.

¶3.     On October 20, 2012, Glidewell, while in the care of WCSC, was admitted to the hospital for severe dehydration and urosepsis, and died the next day.  On December 3, 2014, Edith Kirkland, a surviving daughter of Glidewell, filed a complaint, individually and on behalf of the wrongful-death beneficiaries of Glidewell, in the circuit court.  Kirkland named WCSC; Trend Consultants LLC; and Charles Kelly (collectively WCSC) as defendants.

¶4.     On December 7, 2014, Kirkland's counsel sent the following letter to WCSC attempting to revoke any offer to arbitrate:

> Please accept this letter as our revocation of the arbitration agreement that was signed by Ms. Angela Jones during the admission process of . . . Glidewell. Through this letter the [e]state and [w]rongful [d]eath [b]eneficiaries revoke and are otherwise unwilling to arbitrate any claim against [WCSC].

WCSC filed a motion to compel binding arbitration based on the terms of its admission agreement.  The circuit court denied the motion, finding that the arbitration provision lacked the essential terms of a contract.  Specifically, the circuit court pointed out the contract was not signed by a WCSC representative as required by the express terms of the arbitration provision.  Aggrieved, WCSC now appeals.

---

[1] The record is silent as to Glidewell's age.

**LAW AND DISCUSSION**

¶5. The Federal Arbitration Act (FAA) serves to "[place] arbitration agreements upon the same footing as other contracts." *Shearson /Am. Express Inc., v. McMahon*, 482 U.S. 220, 225-26 (1987). The Mississippi Supreme Court has found that "[a]greements between patients and nursing homes affect interstate commerce and, therefore, fall under the purview of the [FAA]." *Byrd v. Simmons*, 5 So. 3d 384, 388 (¶11) (Miss. 2009). As such, the supreme court has held the following:

> To determine if the parties are bound by arbitration, in this case we must first determine if a contract exists between them. A valid contract must have (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent[,] and (6) no legal prohibition precluding contract formation.

*Grenada Living Ctr. v. Coleman,* 961 So. 2d 33, 36-37 (¶9) (Miss. 2007) (citation omitted). However, the FAA also establishes a "federal policy favoring arbitration" that requires courts to "rigorously enforce agreements to arbitrate." *E. Ford v. Taylor*, 826 So. 2d 709, 713 (¶11) (Miss. 2002) (citing *McMahon*, 482 U.S. at 226). As such, "[d]oubts as to the availability of arbitration must be resolved in favor of arbitration." *IP Timberlands Operating Co. v. Denmiss Corp.*, 726 So. 2d 96, 107 (¶46) (Miss. 1998) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 74 (1983)). Furthermore, "[a]s the court's participation and involvement increase, the reason for arbitration in the first place becomes greatly diminished, and its purpose defeated." *Covenant Health & Rehab. of Picayune LP v. Estate of Moulds ex rel. Braddock*, 14 So. 3d 695, 707 (¶38) (Miss. 2009).

¶6. The standard of review for granting or denying a motion to compel arbitration is de

novo. *See Harrison Cty. Commercial Lot LLC v. H. Gordon Myrick Inc*., 107 So. 3d 943, 949 (¶12) (Miss. 2013) (citation omitted). An appellate court "does not review the merits of the underlying claim." *Id.* at (¶13) (citation omitted).

¶7. On December 21, 2010, Jones signed an admission agreement on behalf of her grandmother, Glidewell. The admission agreement consisted of six sections, sections A-F. However, only a few sections are at issue in the instant case: sections E, F, and the concluding paragraph set forth above the signature lines.

¶8. Section E, the arbitration clause, reads, in relevant part, as follows:

**E.    ARBITRATION-<u>PLEASE READ CAREFULLY</u>**

1.    It is understood and agreed by the Facility and Resident and/or Responsible Party that any legal dispute, controversy, demand or claim (hereinafter collectively referred to as "claim" or "claims") that arises out of or relates to the Admission Agreement, any service or health care provided by the Facility to the Resident or any matter related to the Resident's stay shall be resolved exclusively by binding arbitration pursuant to the [FAA.]

. . . .

2.    The parties agree that any dispute shall be arbitrated by one impartial, unbiased arbitrator who shall be chosen by mutual agreement of the parties. The arbitrator's decision shall be final and binding. The parties agree that judgment may be entered on any arbitration award in any court having jurisdiction.

3.    This agreement to arbitrate includes, but is not limited to, any claim for payment, nonpayment or refund for services rendered to the Resident by the Facility, violations of any rights granted to the Resident by law or by the Admission Agreement, breach of contract, fraud or misrepresentation, negligence, gross negligence, malpractice or any other claim based on any departure from accepted standards of medical or health care or safety whether sounding in tort or in contract. However, this agreement to arbitrate shall not limit the Resident's right

4

to file a grievance or complaint, formal or informal, with the Facility or any appropriate state or federal agency, including any state ombudsman assigned to the facility.

. . . .

5. It is the intention of the parties to this arbitration agreement that it shall inure to the benefit of and bind the parties, their successors and assigns, including the agents, employees and servants of the Facility and all entities in privity with the facility, and all persons whose claim is derived through or on behalf of the Resident, including that of any parent, spouse, child, guardian, conservator, executor, administrator, legal representative, wrongful death heir, or heir of the Resident.

. . . .

7. ***The parties understand and agree that by entering this arbitration agreement, which binds both the Facility and the Resident/ Responsible Party, they are giving up and waiving their constitutional right to have any claim decided in a court of law before a judge and a jury.***

8. The Resident and/or Responsible Party understand that (a) he/she has the right to seek legal counsel concerning this agreement prior to signing it, and (b) this arbitration provision shall remain in effect for all care and services rendered at the Facility and for all admissions, even if such care and services are rendered following the Resident's discharge and readmission to the Facility and even if such care and services were rendered prior to the date this Agreement was executed.

9. The Parties agree that, by executing this Agreement, they will be bound to arbitrate any dispute or claim that is asserted at any time in the future regardless of when the occurrence, events or incidents related to the claim occurred or transpired and regardless of whether the Resident still resides at the Facility.

10. The parties agree the Resident and Responsible Party have other choices with regard to the provision of long term care to the Resident and they enter into this Agreement voluntarily. The parties acknowledge that this Agreement involves interstate commerce and that this Arbitration Agreement shall be governed by and interpreted under the [FAA], 9 U.S.C. [§§] 1-16 [(2012)].

5

(Emphasis in original).

¶9.     Section F of the admission agreement reads as follows:

F.      **MISCELLANEOUS PROVISIONS**

1.      In the event any provision of this agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of this Agreement, which shall remain in full force and effect and [be] enforceable in accordance with its terms.

2.      This Agreement may be executed in any number of counterparts, each of which shall be an original, and all such counterparts together shall constitute but one and the same instrument.

3.      The Resident and Responsible Party availed themselves of the opportunity, if they deemed it desirable, to have had third party advice and legal counsel regarding this Agreement prior to its execution or during the Termination Period set forth in Article D.2.

4.      This Agreement constitutes the entire agreement among the Parties pertaining to the subject matter contained in it and supersedes all prior agreements, representations and all understandings of the parties. No supplement, modification or amendment of this Agreement shall be binding unless expressed as such and executed in writing by all parties hereto.

5.      **ANY RESPONSIBLE PARTY OR PARTIES EXECUTING THIS AGREEMENT REPRESENT AND WARRANT THAT THEY HAVE AUTHORITY, EITHER EXPRESS, IMPLIED OR APPARENT, TO ACT AS AGENT FOR THE RESIDENT AND TO EXECUTE THIS AGREEMENT ON RESIDENT'S BEHALF. LIKEWISE, THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF THE FACILITY REPRESENTS AND WARRANTS THAT THEY [sic] HAVE BEEN AUTHORIZED TO EXECUTE THIS AGREEMENT ON THE FACILITY'S BEHALF.**

(Emphasis in original).

¶10.    After section F, and immediately above the signature lines for an authorized facility

representative and either the resident or representative, the admission agreement states:

> **THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTANDS THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION, AND HAS RECEIVED A COPY OF THIS AGREEMENT, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO AND ACCEPTS ALL OF ITS TERMS.**

(Emphasis in original).

¶11. It is undisputed that Jones signed the admission agreement on Glidewell's behalf and that no representative from WCSC signed the admission agreement. Further, it is undisputed that WCSC began to provide its services for the care of Glidewell on December 21, 2010, and continued to do so until Glidewell's death. Kirkland contends that the circuit court correctly found the arbitration agreement was unenforceable because it lacked the mutual assent of the parties involved. Kirkland asserts that WCSC's failure to sign the admission agreement evidences a lack of assent to the contract's terms.

¶12. Kirkland relies heavily on *Byrd*, 5 So. 3d 384.[2] In *Byrd*, the patient's son signed an admission agreement with a nursing home that had a separate arbitration agreement on the patient's behalf. *Id.* at 386 (¶2). The nursing-home facility signed the general admission agreement, but did not sign the separate arbitration agreement. *Id*. Following the patient's death, the son filed a complaint alleging, among other things, negligence. *Id.* The son also

---

[2] Kirkland also cites several cases outside of our jurisdiction to support her argument. *See Pine Hills Health & Rehab. v. Matthews*, 431 S.W.3d 910 (Ark. 2014) (setting aside arbitration agreement for lack of mutual assent where nursing home did not sign agreement); *Baier v. Darden Rests.*, 420 S.W.3d 733, 739 (Mo. Ct. App. 2014) (setting aside arbitration agreement for lack of mutual assent where employer did not sign agreement); *Bair v. Manor Care of Elizabethtown, PA, LLC*, 108 A.3d 94 (Pa. Super. Ct. 2015) (setting aside arbitration agreement for lack of mutual assent where agreement lacked essential terms and nursing-home signature).

sent a letter to the nursing home revoking the arbitration agreement before any agent or representative of the facility signed the seperate arbitration agreement. *Id.* The Mississippi Supreme Court determined that the son's signature on the arbitration agreement constituted an offer that was revoked before any agent of the nursing home manifested mutual assent. *Id*. at 390 (¶19). The *Byrd* court rendered the separate arbitration agreement as unenforceable. *Id*.

¶13. Here, Kirkland argues that the arbitration agreement and admission agreement, despite being in the same document and not requiring separate signatures, are distinct and separate legal documents. Kirkland contends that the terminology throughout the majority of the admission agreement is fundamentally different from that in the arbitration-agreement section. Specifically, Kirkland suggests that because the arbitration agreement uses the word "execution," it is a distinct agreement that requires a signature to facilitate an "execution" of the agreement.

¶14. WCSC contests Kirkland's argument and draws support from *Slater-Moore v. Goeldner*, 113 So. 3d 521 (Miss. 2013). Although *Slater-Moore* is not a nursing-home case, the case involves an arbitration agreement where one party did not sign the agreement. *Id*. In *Slater-Moore*, a client signed a contract with an attorney for legal counsel that included an arbitration agreement among various other terms of representation and payment; however, the attorney did not sign the contract. *Id.* at 523 (¶1). The attorney provided all of the legal representation requested within the contract, and the client paid the attorney for the service provided. *Id*. at 526 (¶11). The supreme court found that "[t]he parties' actions make it clear

that they intended to be bound by the terms of the written agreement," and upheld the arbitration agreement. *Id*. Further, the supreme court explicitly distinguished *Slater-Moore* from *Byrd*, emphasizing that the arbitration agreement in *Byrd* was a completely separate document rather than a provision within a single contract. *Id*. Because the parties had manifested their assent to the contract's terms through their actions, and arbitration was included within that contract, the court enforced the arbitration agreement. *Id*.

¶15.    We find the facts in *Slater-Moore* analogous to the case at bar.  Although WCSC did not sign the admission agreement, the nursing facility provided its services to Glidewell and was compensated for its services pursuant to the terms of the admission agreement.  As seen in *Slater-Moore*, when the contract provisions are part of the same document, assent to all of the terms of the contract can be inferred through the parties' actions of payment or provision of services.  In this case, the actions of both parties clearly evidence mutual assent to the terms of the admission agreement as a whole.

¶16.    We find Kirkland's argument unpersuasive, and *Byrd* can be distinguished from the case at hand.  There is no evidence to suggest that there are two separate agreements involved.  The mere fact that the admission agreement refers to the arbitration provision as "the arbitration agreement" does not mean that the provision is an entirely separate legal document. In fact, the admission agreement also refers to the arbitration agreement as the arbitration provision – implying that it is simply a part of the admission agreement. Kirkland's contention that only the arbitration provision required execution in the form of signatures relies far too heavily upon the technical definition of the term "execution."  The

9

supreme court has recognized that

> [o]rdinarily one of the acts forming part of the execution of a written contract is the signing of it, and the mere fact that a written instrument purports to be an agreement does not constitute it a binding contract where it is not signed. However, signature is not always essential to the binding force of an agreement, and whether the signing of the instrument is a condition precedent to its becoming a binding contract usually depends on the intention of the parties. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, as, for example, by the acts or conduct of the parties.
>
> . . . .
>
> The question as to whether those who have signed are bound is generally to be determined by the intention and understanding of the parties at the time of the execution of the instrument. The reason for holding the instrument void is that it was intended that all the parties should execute [the agreement] and that each executes it on the implied condition that it is to be executed by the others, and, therefore, that until executed by all it is inchoate and incomplete and never takes effect as a valid contract, and this is especially true where the agreement expressly provides, or its manifest intent is, that it is not to be binding until signed.

*Turney v. Marion Cty. Bd. of Educ.*, 481 So. 2d 770, 774 (Miss. 1985) (quoting 17 C.J.S. *Contracts* § 62 (1963)). As such, while a signature *may* be required for execution, the arbitration agreement's requirement of execution may be shown through actions or conduct. *See also Slater-Moore*, 113 So. 3d at 526 (¶11). Furthermore, there is no separate signature line for the arbitration agreement, merely a single line at the end of the admission agreement that refers to the contract in its entirety.

¶17. We note that Kirkland attempted to revoke the arbitration agreement, but her attempt came two years after Glidewell's death and almost four years after WCSC began providing

its services.[3] To allow Kirkland to take issue now with a provision of the admission agreement years after WCSC executed the contract through its provision of services would be a windfall. In short, since Glidewell benefitted from the contract, she must be held accountable to its terms.

¶18. After a review of the record, we find that the trial court erred in finding that the arbitration provision in the admission agreement lacked the essential terms of a contract. Although WCSC did not sign the agreement that included the arbitration provision, the contract became binding when WCSC began providing nursing services to Glidewell. In light of our findings, we reverse and remand this case for further proceedings consistent with this opinion.

¶19. **THE JUDGMENT OF THE WILKINSON COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**LEE, C.J., GRIFFIS, P.J., BARNES, CARLTON, FAIR, WILSON AND GREENLEE, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

---

[3] Further, it is questionable whether Kirkland possessed the legal authority to revoke an offer signed by Jones.

11