# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00577-COA

**JP&G LLC D/B/A ORKIN F/K/A JRGT LLC**                    APPELLANT

**v.**

**JAMES VOSS AND CANDY VOSS**                    APPELLEES

DATE OF JUDGMENT:             05/12/2020
TRIAL JUDGE:                  HON. CLAIBORNE McDONALD
COURT FROM WHICH APPEALED:    LAMAR COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:      PAUL PACIFIC BLAKE
                              ROBERT P. THOMPSON
ATTORNEYS FOR APPELLEES:      PAUL MANION ANDERSON
                              SAMUEL STEVEN McHARD
NATURE OF THE CASE:           CIVIL - CONTRACT
DISPOSITION:                  AFFIRMED AND REMANDED - 11/16/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., GREENLEE AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.     JP&G LLC (JP&G) appeals from the circuit court's order denying JP&G's motion to compel arbitration and to stay proceedings. JP&G argues the circuit court erred by (1) finding the contract invalid in its entirety because it was not signed by a JP&G representative, and (2) finding the arbitration agreement nonexistent and unenforceable.

## FACTS AND PROCEDURAL HISTORY

¶2.     JP&G is a Mississippi pest-control company that conducts business as "Orkin." It is undisputed that on October 27, 2009, James and Candy Voss entered into an agreement with JP&G for pest-control treatment and damage repair. Thereafter, JP&G treated the Vosses'

home for termites, and the Vosses provided payment to JP&G.

¶3.     The agreement, titled "Mississippi 7-Year Subterranean and Formosan Termite Directed Liquid + Bait Treatment and Monitoring Service Repair Agreement" (the Agreement), includes fifteen provisions. Provisions one through fourteen are listed in numerical order on the front of the document, followed by a section at the bottom with a designated signature line for JP&G's branch manager and for the customer. The Vosses signed the Agreement on the customer's signature line, but the line designated for the JP&G's branch manager was never signed. The fifteenth provision is on the back of the document by itself, with a single line for initials below it, though the document does not specify which party's initials were required. Regardless, the line was left blank and had not been initialed by either party.

¶4.     The Agreement provisions relevant for this appeal are as follows,[1] on the front:

> 4.     LIMITATION OF LIABILITY: Customer expressly waives any claim for economic compensatory or consequential damages relating to the existence of Subterranean termites or Formosan termites or Subterranean termite or Formosan termite damage. The Customer acknowledges that Orkin is performing a service and except for termite damage repairs set forth above, and except for any damage to the structure caused by Orkin in the performance of its services, Customer waives any claims for property damage. Customer agrees that under no circumstances, with the sole exception of any claim for termite damage repairs, shall Orkin be liable for any amount greater than the amount paid by the Customer to Orkin for the termite service to be performed. Nothing in this Agreement shall be construed as depriving the Customer of remedies available under applicable state consumer

---

[1] The relevant provisions of the Agreement are quoted within the opinion in a larger font size than was utilized by JP&G as the drafter of the document. As reflected in the transcripts, due to the smaller size of the font, the trial court used a magnifying glass to review the provisions.

2

protection laws.

. . . .

9. ENTIRE AGREEMENT: This Agreement and the attached Treatment Report shall be the entire Agreement between Customer and Orkin. . . . Customer warrants and acknowledges that Customer has not relied on or been induced by any other agreements, understandings or representations, whether written or oral, in signing this Agreement. . . . If any provision or portion thereof of this Agreement is found to be invalid or unenforceable, it shall not affect the validity  or enforceability of any other part of the Agreement[.] Provided, however, that as to paragraph 4, MEDIATION/ARBITRATION, if the sentence precluding the arbitrator from conducting an arbitration proceeding as a class, representative[,] or private attorney general is found to be invalid or unenforceable then the entirety of paragraph 4 shall be deemed deleted from this Agreement.

10. APPLICABLE LAW: This Agreement shall be governed by and construed under the laws of the State of Georgia, without regard to its conflicts of laws principles.

On the back, the sole provision read:

15. MEDIATION/ARBITRATION: ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE SERVICES PERFORMED BY ORKIN UNDER THIS AGREEMENT OR ANY OTHER AGREEMENT, REGARDLESS OF WHETHER THE CONTROVERSY OR CLAIM AROSE BEFORE OR AFTER THE EXECUTION, TRANSFER[,] OR ACCEPTANCE OF THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ANY TORT OR STATUTORY CLAIMS, AND ANY CLAIMS FOR PERSONAL OR BODILY INJURY OR DAMAGE TO REAL OR PERSONAL PROPERTY, SHALL BE SETTLED BY BINDING ARBITRATION. UNLESS THE PARTIES AGREE OTHERWISE, THE ARBITRATION SHALL BE ADMINISTERED UNDER THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA") AND SHALL BE CONDUCTED BY AAA. . . . THE ARBITRATOR'S POWERS TO CONDUCT ANY ARBITRATION PROCEEDING UNDER THIS AGREEMENT SHALL BE LIMITED AS FOLLOWS: ANY ARBITRATION PROCEEDING UNDER THIS AGREEMENT . . . WILL NOT PROCEED AS A CLASS ACTION,

PRIVATE ATTORNEY GENERAL ACTION[,] OR SIMILAR REPRESENTATIVE ACTION. . . . CUSTOMER AND ORKIN ACKNOWLEDGE AND AGREE THAT THIS ARBITRATION PROVISION IS MADE PURSUANT TO A TRANSACTION INVOLVING INTERSTATE COMMERCE AND SHALL BE GOVERNED BY THE FEDERAL ARBITRATION ACT.

¶5.     On January 22, 2020, the Vosses filed a civil action against JP&G, alleging JP&G failed to provide proper termite treatment that resulted in termite infestation and damage to the Vosses' home. JP&G responded by filing a motion to compel arbitration and to stay proceedings on March 9, 2020, and argued that the Vosses' claims were related to the services provided under the contract and within the scope of the Agreement's arbitration provision. The Vosses filed a motion in opposition on April 9, 2020, contending that the arbitration provision was not enforceable because it had not been initialed, and they had not agreed to it. On May 12, 2020, the circuit court entered an order denying JP&G's motion to compel arbitration upon finding that the arbitration provision was invalid and that the Agreement was nonexistent because it was never executed by JP&G's branch manager; there was no mutual assent or meeting of the minds between the parties;[2] and the arbitration clause was procedurally unconscionable. Aggrieved, JP&G appeals.

## DISCUSSION

¶6.     On appeal, JP&G argues that the Vosses should be compelled to arbitrate on the grounds that the parties' Agreement created a valid and binding contract to arbitrate and that the Vosses' claims are within the scope of the arbitration clause. JP&G contends that the

---

[2] The circuit court held there was no mutual assent between the parties because the arbitration provision was not made known to the Vosses, not initialed, not observable from the front page, and not referenced or incorporated on the front page.

4

Vosses' failure to initial the arbitration provision was irrelevant and suggests that assent to the arbitration provision can be inferred by the Vosses' receipt of services under the contract. JP&G further claims that the arbitration provision is neither procedurally nor substantively unconscionable and thus enforceable.

¶7.    A review of the record shows that when the circuit court conducted its analysis, it examined not only whether there was a valid agreement to arbitrate specifically, but the court also made a determination as to the contractual validity of the Agreement overall. For example, the first ground the circuit court gave to support its holding was that the contract as a whole was invalid because the Agreement was never signed by JP&G's branch manager and thus was never executed. As stated by the United States Supreme Court,

> attacks on the validity of the contract, as distinct from attacks on the validity of the arbitration clause itself, are to be resolved "by the arbitrator in the first instance, not by a federal or state court." (citation omitted). For these purposes, an "arbitration provision is severable from the remainder of the contract," (citation omitted), and its validity is subject to initial court determination; but the validity of the remainder of the contract (if the arbitration provision is valid) is for the arbitrator to decide.

*Nitro-Lift Techs. L.L.C. v. Howard*, 568 U.S. 17, 20-21 (2012) (quoting *Preston v. Ferrer*, 552 U.S. 346, 349 (2008)). In this case, the Vosses challenged the validity of the arbitration provision only, not the validity of the contract itself. Accordingly, it was beyond the circuit court's authority to determine whether the Agreement in its entirety was a valid contract, and it was improper to use such determination as a basis for denying the existence of an agreement to arbitrate. Because the circuit court should have only addressed whether the Vosses and JP&G agreed to arbitrate their claims, this Court will limit our review and decline

to discuss JP&G's failure to sign the Agreement.[3] We confine our review to determining whether provision fifteen on the back page was part of, or incorporated into, the alleged Agreement such that it created a valid agreement to arbitrate.

##  I.       Applicable State Law

¶8.     The United States Supreme Court has explicitly stated that "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). In Mississippi, when a contract includes an applicable law provision, "[t]he general rule is that

---

[3] JP&G's failure to sign and execute the Agreement was not an issue raised by either party, nor did JP&G contest the enforceability of the Agreement based on the failure to execute the Agreement according to its terms.

> [T]he parties may agree to be bound by their written contract even though it is not signed by either of them, or when it is signed by only one of them. . . . The rule is that acceptance of a contract as binding upon a party may be shown by his actions, and any definite and unequivocal course of conduct disclosing that the party has acceded or assented to it, is as binding on him as had he endorsed his assent in formal writing. And although he may have stipulated that the contract shall not be binding on him until formally accepted by him in writing, that stipulation may be waived by him and is waived when he acts upon and under the contract by conduct[.]

*McInnis v. Se. Automatic Sprinkler Co.*, 233 So. 2d 219, 221-22 (Miss. 1970). JP&G provided services to and received payments from the Vosses, evidencing JP&G's assent to the Agreement as a binding contract. JP&G also waived the terms stipulating that the Agreement would not be valid until approved by the branch manager when JP&G filed its motion to compel arbitration and sought to enforce rights granted by the Agreement. *Id*. Thus, because the Vosses' claims were based on the Agreement, and JP&G's conduct showed assent to be bound by the Agreement, the lack of a signature by JP&G's branch manager was not an issue, and it was not proper for the circuit court to decide the resulting effect.

courts will give effect to an express agreement that the laws of a specified jurisdiction shall govern." *Cox v. Howard, Weil, Labouisee, Friedrichs Inc.*, 619 So. 2d 908, 911 (Miss. 1993). We note that provision ten of the parties' Agreement specifies that the Agreement is governed by and to be construed under the laws of the State of Georgia. Thus, as an initial matter, this Court will first determine whether to apply Georgia or Mississippi law to the issue in this case. Regardless, existing law and precedent in both states leads us to the same result.

¶9.    In *Cox*, our supreme court found that "the parties, a Mississippi resident and a corporation with offices in Mississippi, . . . stated that their contract would be governed by the law of another state, New York[,]" and held that "New York law should govern any action based on their contract." *Id.* The supreme court then went on to interpret the arbitration provision found in the contract in *Cox* and stated, "It is clear that New York law should apply to construction of the terms of the Customer's Agreement" and applied New York law to determine the enforceability of the arbitration provision. *Id.* at 912-13.

¶10.   Although the Vosses' residence is in Mississippi, JP&G's business is affiliated with Mississippi, and the pest-control services were rendered in Mississippi, the Agreement's terms expressly state that it is governed by the laws of another state, Georgia. Following the general rule from *Cox*, Georgia law should govern the issue here as it arises from the parties' contractual Agreement. *Id.* at 911.

## II.    Arbitration Agreement Under Georgia Law

¶11.   Under Georgia law, the court "review[s] a trial court's order granting or denying a

motion to compel arbitration de novo." *Hunter v. Lowndes Cnty. Health Servs LLC*, 844 S.E.2d 261, 263 (Ga. Ct. App. 2020); *see also Aaron v. United Health Servs. of Ga. Inc.*, 826 S.E.2d 442, 443 (Ga. Ct. App. 2019). "Whether a valid and enforceable arbitration agreement exists is a question of law for the court." *Hunter*, 844 S.E.2d at 263. "The first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Samaca LLC v. Cellairis Franchise Inc.*, 813 S.E.2d. 416, 419 (Ga. Ct. App. 2018). Arbitration agreements are "generally governed by state law principles of contract formation." *Aaron*, 826 S.E.2d at 444. "To constitute a valid contract, there must be, among other things, 'the assent of the parties to the terms of the contract.'" *United Health Servs. of Ga. Inc. v. Alexander*, 802 S.E.2d 314, 317 (Ga. Ct. App. 2017) (quoting Ga. Code Ann. § 13-3-1). When "determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent[.]"[4] *Aaron*, 826 S.E.2d at 444.[5]

¶12.     Under Georgia law, "[i]t is well settled that an agreement between two parties will occur only when the minds of the parties meet at the same time, upon the same subject-matter, and in the same sense." *Cox Broad. Corp. v. Nat'l Collegiate Athletic Ass'n*,

---

[4] The court further explained that "courts apply an objective theory of intent whereby one party's intention is deemed to be [the] meaning [that] a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent[.]" *Aaron*, 826 S.E.2d at 444.

[5] "Under Georgia law, a written, unsigned contract can be enforceable if the parties mutually assent to its terms." *Aaron*, 826 S.E.2d at 444. The Georgia Court of Appeals has also stated that "[i]t is proper in determining the enforceability of an unsigned arbitration agreement to consider whether the customer was knowledgeable of industry practices." *Comvest L.L.C. v. Corp. Sec. Grp. Inc.*, 507 S.E.2d 21, 24 (Ga. Ct. App. 1998).

8

297 S.E.2d 733, 737 (Ga. 1982). "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Samaca*, 813 S.E.2d at 419.

¶13.   In *Aaron*, the plaintiff sued a nursing home for the wrongful death of his mother, a patient. *Aaron*, 826 S.E.2d at 443-44. The nursing home filed a motion to compel arbitration, claiming the plaintiff had signed an arbitration agreement at the time his deceased mother was admitted to the nursing home. *Id*. at 444. The Georgia court found that the plaintiff had in fact "signed the [a]greement and initialed each page, indicating his intent to be bound by it."[6] *Id*.   Ultimately, the court held that "[t]he record before [it] support[ed] the conclusion that the parties mutually agreed to arbitrate [the plaintiff's] claims." *Id.*

¶14.   The Georgia court was subsequently presented with a similar issue in *Hunter*, where an arbitration agreement was allegedly entered into by a plaintiff and a care facility that sought to enforce the arbitration agreement. *Hunter*, 844 S.E.2d at 263. The court found that the plaintiff had signed the agreement in the designated signature block, but "each of the two pages [of the agreement] contained blocks for initials, [and] the blocks were unsigned."[7] *Id*. at 262. The court noted the signature block was below a provision that included the terms of arbitration, explained that the parties waived their right to a jury trial, and specifically stated

---

[6] The court found that the parties had "a partially executed arbitration agreement" that the plaintiff signed, but "[n]o representative of [the nursing home had] signed the [a]greement, even though the [a]greement contain[ed] a signature block for a [nursing home] representative to sign." *Aaron*, 826 S.E.2d at 443.

[7] The Georgia court also determined that "[t]here was a signature block for 'Facil[ity]'s Authorized Agent,' but no one signed the [a]greement on behalf of [the facility], nor was the 'Facility's Authorized Representative' identified by name." *Hunter*, 844 S.E.2d at 262.

9

that "[t]he parties intend that this Arbitration Agreement shall benefit and be binding upon the parties[.]" *Id* at 262-63. Moreover, the plaintiff explicitly acknowledged that she had assented to arbitration when she sent a letter to the facility stating that "she was nonetheless withdrawing her [prior] assent to arbitrate based on the [a]greement." *Id.* at 263. The court concluded that the plaintiff had initially assented to arbitration by signing the agreement, but then she validly revoked her assent before the facility signed the agreement or otherwise expressed its assent to the agreement. *Id.* at 264. Thus, the Georgia court held there was no mutual assent to arbitrate and no meeting of the minds. *Id.*

¶15.    The facts of the instant case indicate that the Vosses had not assented to arbitration and that there was no meeting of the minds between the parties to include provision fifteen in their Agreement. First, the record shows that the Vosses had signed only the front of the Agreement and had not filled out the line for initials on the back page, which appeared after the signature block in sequence. According to *Aaron*, the Vosses' signatures on the front page indicate that they intended to be bound by the terms on the front page of the Agreement. *Aaron*, 826 S.E.2d at 444-45. Conversely, the lack of initials on the back page suggests that the Vosses did not intend to be bound by the terms on the back of the Agreement and thus did not intend to be bound by provision fifteen's arbitration requirements.

¶16.    Second, none of the provisions on the front of the Agreement reference a back page or a fifteenth provision, such that it would have put the Vosses on notice. Looking at the contents on the front page, the Agreement uses the word "arbitration" in only one place, which is within provision nine. Provision nine makes an internal reference to provision four

and characterizes provision four as the "Mediation/Arbitration" provision. Provision nine also references a specific sentence purportedly stated in provision four that allegedly precludes certain arbitration proceedings. However, provision nine's reference is plainly inaccurate because provision four is actually titled "Limitation of Liability" and does not make any mention of arbitration. Not only does the front page of the Agreement fail to reference arbitration in the correct context, unlike *Hunter*, the signature block here was not preceded by a clause explaining the types of claims the Vosses would be required to arbitrate, the waiver of their right to a jury trial, or any other details about arbitration. *Hunter*, 844 S.E 2d at 262-63. Additionally, provision fourteen was directly above the signature block, which consisted of blank lines for additional comments.

¶17. Based on a thorough review of the evidence, at the time the Agreement was entered, the Vosses did not know about the additional fifteenth provision on the back page; were not aware that JP&G attempted to include arbitration as part of the subject matter of the Agreement; and did not have the same understanding as JP&G as to the requirement of arbitrating claims against JP&G. Thus, we conclude that the Agreement between the Vosses and JP&G did not include an agreement to arbitrate, and we affirm the circuit court's denial of JP&G's motion to compel arbitration.

### III. Arbitration Agreement Under Mississippi Law

¶18. While the general rule is to apply the law of the jurisdiction specified in an agreement's applicable-law provision, the Mississippi Supreme Court has also held that the governing law may be "that which [the] parties intended or may fairly be presumed to have

11

intended" to apply. *Cox*, 619 So. 2d at 911. Despite the Agreement's "Applicable Law" provision, both JP&G and the Vosses presented only Mississippi law, and neither raised the issue of which state's law applies. Therefore, this Court will also examine whether an arbitration agreement exists between the Vosses and JP&G under Mississippi law.

¶19.   "The standard of review for granting or denying a motion to compel arbitration is de novo." *Wilkinson Cnty. Senior Care LLC v. Kirkland*, 196 So. 3d 1143, 1145 (¶6) (Miss. Ct. App. 2016). This Court "appl[ies] a two-pronged test to determine whether arbitration should be enforced" on a motion to compel arbitration. *Caplin Enters. Inc. v. Arrington*, 145 So. 3d 608, 613 (¶8) (Miss. 2014). The Mississippi Supreme Court has explained,

> Under the first prong, we determine whether the parties have agreed to arbitrate the dispute. This [first] prong has two aspects: (1) whether there is a valid arbitration agreement and (2) whether the parties' dispute is within the scope of the arbitration agreement. If we determine that the parties did not agree to arbitrate the dispute at issue, the analysis is at an end[.]

*Id.* (citations and internal quotation marks omitted). Only if this Court first "conclude[s] that the parties did agree to arbitrate," will we then proceed to the second prong.[8] *Id.*

¶20.   Under Mississippi law, to determine whether a valid arbitration agreement exists "[w]hen a party objects to arbitration of a claim because it has not signed an agreement to arbitrate, the threshold question a court must consider is whether that party entered into a contractual agreement to arbitrate." *Hancock Mech. LLC v. McClain Contracting*, No. 1:17CV54-HSO-JCG, 2018 WL 702687, at *3 (S.D. Miss. Feb. 2, 2018); *see also Caplin*, 145 So. 3d at 613 (¶8) ("To determine if the arbitration agreement is valid, we apply contract

---

[8] The second prong asks courts to determine "whether legal constraints external to the parties' agreement foreclosed arbitration of those claims." *Caplin*, 145 So. 3d at 613 (¶8).

law to analyze whether a valid contract exists between the parties"). An agreement must include the following elements to be a valid contract: "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Grenada Living Ctr. LLC v. Coleman*, 961 So. 2d 33, 37 (¶9) (Miss. 2007).

¶21.   "The mutual assent of each of the contracting parties to the terms of the contract is essential to the formation of a valid contract" and "is determined by considering whether the parties mutually agreed to the terms offered and accepted." *Blake v. Murphy Oil USA Inc.*, No. 1:10-CV-128-SA-JAD, 2010 WL 3717245, at *3 (N.D. Miss. Sept. 14, 2010) (citing *Lanier v. State*, 635 So. 2d 813, 826 (Miss.1994), *overruled on other grounds by Twillie v. State*, 892 So. 2d 187, 190 (¶11) (Miss. 2004)). As stated by the United States Supreme Court, "[i]t is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances." *AT&T Techs. Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 651 (1986).  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Pre-Paid Legal Serv. Inc. v. Battle*, 873 So. 2d 79, 83 (¶13) (Miss. 2004).

¶22.   In *Battle*, our supreme court declared that when determining whether "the parties have agreed to arbitration," the reviewing court "must balance the intent of the parties with the constitutional right to a trial by jury[.]" *Id*. at 84 (¶15). The court based its conclusion in part on whether "an average citizen would realize that he or she [was] giving up his or her right to a trial by jury under the . . . language contained in the" arbitration agreement. *Id*. After

finding that the only contract signed by the plaintiffs did not include arbitration language, the supreme court declared the arbitration agreement invalid and nonexistent because the evidence showed "[t]here was no notice, no discussion, and no negotiation of the arbitration agreement." *Id*.

¶23.    Under the *Battle* precedent alone, we find the alleged arbitration agreement between the Vosses and JP&G invalid and nonexistent. As explained previously, the only arbitration language found in the Agreement here is a reference to "arbitration" in provision nine in the context of an arbitrator conducting certain types of arbitration ("as a class, representative[,] or private attorney general"); and the resulting affect "if the sentence precluding the arbitrator from conducting" certain types of arbitration "is found to be invalid or unenforceable[.]" The actual arbitration provision that JP&G stakes it claim on is found on the back, on page two, and is not referenced or incorporated in the body of the Agreement on the front, page one. Moreover, the arbitration provision on page two does not include language advising the customers, the Vosses, that by signing the Agreement, they would be waiving their right to a trial by jury. *Id*. Review of the evidence shows "[t]here was no notice, discussion, and no negotiation of the arbitration agreement" between the Vosses and JP&G. *Id*. Therefore, no arbitration agreement existed as part of this contractual Agreement.

¶24.    Nonetheless, for thoroughness, we examine two cases similar to the instant case for further support. This Court previously had the opportunity to consider whether the parties to a contract intended to enter an arbitration agreement in *Mason*, where the arbitration clause at issue was found within a multi-page care center's admission agreement. *Cmty. Care Ctr.*

14

*of Vicksburg LLC v. Mason*, 966 So. 2d 220, 223 (¶3) (Miss. Ct. App. 2007). Page five stated, "ARBITRATION-PLEASE READ CAREFULLY," followed by a line for the resident's initials. *Id*. at (¶4). Page six had three designated places for the resident's signature, and on the bottom of the page below those signature lines, the following statement appeared in bold:

> THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTOOD THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION . . . AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO AND ACCEPTS ALL OF ITS TERMS.

*Id*. at (¶3). At the top of page seven, there was a signature block for the resident and a signature block for the facility representative. *Id*. at (¶4). The resident had signed the agreement in the designated areas on both page six and page seven but had failed to initial the line by the arbitration clause on page five. *Id*. The Court held the failure to initial the arbitration clause was not dispositive of the intent to arbitrate because the resident's signature appeared directly under a section that referenced the arbitration clause. *Id*. at 227 (¶14). Consequently, the court examined the resident's affidavit and the terms of the contract to determine the parties' intent as to arbitration. *Id*. The statements in the resident's affidavit were found "to be much more akin to an acknowledgment that [the resident] did not read the provision than to a claim she intentionally rejected it[,]" such as "stat[ing] she ha[d] no recollection that an arbitration agreement was included in the documents[.]" *Id*. at 228-29 (¶19). Upon review of the contract, the Court noted "[t]he arbitration provision [was], however, prominently displayed in the contract, and a reference to it appear[ed] in all capital, bold letters immediately before [the resident's] signature." *Id*. at 228 (¶19). The Court held

that "[t]here [was] no evidence of an intent to invalidate the arbitration agreement" by the resident, and that "her failure to initial the arbitration provision [did not] invalidate[] the arbitration agreement[.]" *Id*. at 229 (¶20). Thus, this Court found a valid arbitration agreement existed between the parties. *Id*.

¶25.    Unlike *Mason*, the initial line here came after the signature block, and the signature block was not directly under a section that referenced the arbitration clause. The arbitration provision was not "prominently displayed in the contract"; it was inserted on the back page and did not appear "in all capital, bold letters immediately before [the Vosses'] signature" on the front page. *Id*. at 228 (¶19). The instant case is also distinguishable on the grounds that the Vosses' affidavits convey that they were never aware of the back-page arbitration clause and specifically stated they did not intend or agree to arbitrate, rather than being "akin to an acknowledgment that [the Vosses] did not read the provision." *Id*. at 228-29 (¶19).

¶26.    After *Mason*, this Court was confronted with a similar issue in *Kirkland*, 196 So. 3d at 1147 (¶11), where a senior care facility attempted to enter into an admission agreement with a patient, but the facility failed to have a representative sign the agreement. The body of the admission agreement included a section designated, "E. ARBITRATION-*PLEASE READ CAREFULLY*," which set out the specific elements and requirements of arbitration. *Id*. at 1145 (¶8). At the end of the admission agreement, directly above the designated signature lines, there was a clause stating:

> THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTANDS THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION, . . . AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO AND ACCEPTS ALL OF ITS TERMS.

16

*Id*. at 1147 (¶10). Regardless of the facility's failure to sign the admission agreement, the "facility provided its services to [the patient] and was compensated for its services pursuant to the terms of the admission agreement" continuously until the patient's death. *Id*. at 1148 (¶15). The patient's beneficiary claimed there was not a binding agreement and alleged that the facility's failure to sign the admission agreement showed its lack of assent to the agreement's terms. *Id*. at 1147 (¶11). The beneficiary also attempted to "argue . . . that the arbitration agreement and admission agreement . . . [were] distinct and separate[9] legal documents." *Id*. at (¶13). The Court declared that the agreements were not separate and distinct documents upon finding that

> the admission agreement also refer[red] to the arbitration agreement as the arbitration provision-implying that it [was] simply a part of the admission agreement, . . . [and] there [was] no separate signature line for the arbitration agreement . . . [but] merely a single line at the end of the admission agreement that refer[red] to the contract in its entirety.[10]

*Id*. at 1148 (¶16). As relevant here, *Kirkland* stands for the proposition that "when the contract provisions are part of the same document, assent to all of the terms of the contract[, including arbitration,] can be inferred through the parties' actions of payment or provision of services." *Id*. at (¶15). The Court ultimately concluded the admission agreement "included

---

[9] The beneficiary alleged there were two separate agreements because the language used in each was "fundamentally different[.]" Despite the beneficiary's contentions, the Court stated that the different terminology in the agreements was not evidence of two entirely separate agreements.

[10] "The mere fact that the admission agreement refer[red] to the arbitration provision as 'the arbitration agreement' [did] not mean that the provision [was] an entirely separate legal document. In fact, the admission agreement also refer[red] to the arbitration agreement as the arbitration provision-implying that it [was] simply a part of the admission agreement." *Kirkland*, 196 So. 3d at (¶16).

the arbitration provision, [and] the contract became binding when [the facility] began providing nursing services" despite the facility's failure to sign. *Id*. at 1149 (¶18). Therefore, this Court held that the parties had a valid and binding agreement to arbitrate. *Id*.

¶27. The Agreement here is distinct from *Kirkland* because the front page of the Agreement, which focuses on the parties' agreement regarding pest-control services, did not reference the arbitration agreement on the back page and could not have "impl[ied] that it [was] simply a part of the [pest-control] agreement." *Id.* at 1148 (¶15). Additionally, in the case before us, there was a "separate signature line for the arbitration agreement" on the back page rather than "merely a single line at the end of the . . . [A]greement that refer[red] to the contract in its entirety[,]" as in *Kirkland*. *Id*. at 1149 (¶16). Because we find the arbitration provision was not part of the Agreement, the Vosses' conduct of providing payment to JP&G for services rendered is not a valid basis for inferring the Vosses' assent to the arbitration terms. Therefore, we conclude that the Vosses did not intend to agree to arbitrate their claims against JP&G, and we hold that no valid arbitration agreement exists between the parties.

¶28. Because we find no valid arbitration agreement, we decline to discuss whether the Vosses' claims are within the scope of arbitration and procedural or substantive unconscionability. *Caplin*, 145 So. 3d at 613 (¶8).

## CONCLUSION

¶29. After a review of the record, we find that no valid arbitration agreement existed between the Vosses and JP&G. The parties did not have the mutual assent necessary to agree to the terms of the purported arbitration provision. Accordingly, we affirm the circuit court's

18

order denying JP&G's motion to compel arbitration and remand for further proceedings consistent with this opinion.

¶30.	**AFFIRMED AND REMANDED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**